IN THE MATTER OF FRANK A. PAGLIANITE, AN
ATTORNEY AT LAW.

June 14, 1982.

*Richard L. Bland, Jr.* argued the cause for the District V Ethics Committee.

*John G. Gilfillan* argued the cause for the District X Ethics Committee.

The respondent did not appear.

## ORDER

The Disciplinary Review Board having filed reports with this Court in October 1979 and March 1982 charging FRANK A. PAGLIANITE, formerly of West Caldwell, with unprofessional conduct; and

This Court having ordered said FRANK A. PAGLIANITE to show cause why he should not be disbarred or otherwise disciplined; and

Counsel appearing for respondent having been afforded an opportunity to submit additional written arguments in mitigation on or before May 14, 1982; and

Counsel having advised this Court that he could not submit additional papers due to the unavailability of the respondent; and

This Court having duly considered respondent's prior failures to cooperate in these proceedings and having determined that this matter should proceed to a final disposition on the merits, and good cause appearing;

It is ORDERED that the reports of the Disciplinary Review Board are hereby adopted and FRANK A. PAGLIANITE is

hereby disbarred and his name stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that respondent is hereby permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with all the regulations of the Disciplinary Review Board governing disbarred attorneys.

### Decision and Recommendation of the Disciplinary Review Board

### July 18, 1979.

To the Honorable Chief Justice and Associate Justices of the Supreme Court of New Jersey:

This matter is before the Board based upon a presentment filed by the District Ethics Committee for the Counties of Morris, Sussex and Warren. The presentment is replete with allegations of unethical behavior and improper and careless recordkeeping on respondent's part. Upon a review of the full matter the Board is satisfied that the conclusions of the Committee are fully supported by clear and convincing evidence.

The record reveals that in December 1974 respondent assumed a major role in a loan transaction which can safely be described as usurious. It appears that in December 1974 Louis and Louise Nigro, who were longtime friends and clients of respondent, and their son-in-law, Joseph Dubicki, Jr., agreed to loan $16,300 to Anthony J. Costanzo, also a past client of respondent, and his corporation, Linco Affiliated Interests, Inc. The terms of the agreement provided that the full loan plus $4,000 in interest was to be repaid within forty days from the date of the loan. Thus the total amount to be repaid was $20,300.

On the morning of December 10, 1974 Messrs. Nigro, Dubicki and Costanza met at respondent's office. A discussion was held with reference to the legality of the proposed loan and the propriety of respondent's role concerning the loan transaction. Respondent assured Dubicki and Nigro that the loan was legal and that there was no conflict in his position. He first recom-

mended to Nigro and Dubicki that they not make the loan, but he later changed his mind and recommended that the monies be loaned. Respondent also suggested that security be given for the loan and as a result arrangements were made to obtain the deed to certain property in Roselle which was to serve as collateral for the loan.

Nigro and Dubicki left respondent's office and returned a short time later with a brown paper bag containing $16,300 in cash. At that time Costanza executed a Corporate Resolution and Promissory Note, prepared at respondent's direction, indicating he had borrowed $20,300 from Joseph Dubicki, Jr.

Although the loan was partially repaid, both Mr. Nigro and the respondent agree that a sum of $8,300 remains outstanding.

The Board finds that respondent's participation in the above matter clearly breached the bounds of ethical propriety. Firstly, respondent never disclosed to Nigro and Dubicki his previous representation of Costanza and never explained to them the possible conflict that might have affected the transaction. Furthermore, it is evident that respondent failed to properly investigate or advise Nigro and Dubicki as to the worth of the property which was being used as collateral by Costanza. The property was in fact virtually worthless and, further, respondent failed even to obtain from Costanza an Affidavit of Title. The above deficiencies, however, are overshadowed by the fact that respondent helped persuade his clients, Nigro and Dubicki, to participate in a clearly illegal loan transaction.

Thereafter in February 1975 respondent advised Mr. and Mrs. Nigro that he was in need of funds and wished to borrow money from them. In response to this request the Nigros loaned respondent the sum of $10,000, which Mr. Nigro personally delivered to respondent at his home. The money was then deposited in respondent's general business account.

Although this loan was eventually repaid, the Board finds that respondent's conduct in soliciting and receiving a substantial loan from clients whom he was then representing in another

transaction (the Costanza loan) placed him in an untenable position in regard to his clients. It seems apparent that no attorney should solicit a personal loan from a client whom he is presently representing in another matter.

In addition to his unethical involvement in the loan transactions described above, the Committee's examination of respondent's conduct was hampered by the fact that respondent's financial records were in a state of disarray and in total noncompliance with the requirements of R. 1:21-6. Respondent's ledgers were out of sequence; he had no method of identifying any particular client's funds in his trust account; and he was unable to adequately reconstruct his trust account and attorney account transactions. Because of this faulty bookkeeping respondent did not account accurately for disbursements made in another unrelated matter in which he represented the Nigros.

Adding to this confused situation is the fact that respondent's records reveal that he commingled personal and business funds together with clients' funds in his trust account.

The Board further observes that respondent's testimony before the Committee was fraught with contradictions and vagueness, which certainly compounded the Committee's and this Board's task in sifting through all aspects of this case.

## CONCLUSION AND RECOMMENDATION

The findings above mandate the conclusion that respondent has committed serious violations of the Code of Professional Responsibility, *i.e.* DR 1–102(A)(4) and (6); DR 5–105(A) and DR 9–102 and that his recordkeeping methods were in total contravention of the dictates of R. 1:21-6.

The Board has also been advised that the District X Ethics Committee is presently processing approximately six other ethics complaints involving respondent, several of which, at least on their face, contain serious allegations of professional misconduct. This being the case, the Board has determined to defer a final recommendation for discipline until the other pending matters

are processed to conclusion by the District Committee. In the interim, however, the Board is of the unanimous opinion that respondent should be temporarily suspended from the practice of law in order to protect the interests of his clients and the public.

DATED: October 10, 1979

DISCIPLINARY REVIEW BOARD

By: Dickinson R. Debevoise

Dickinson R. Debevoise
Chairman

Decision and Recommendation of the Disciplinary
Review Board

February 9, 1982.

To the Honorable Chief Justice and Associate Justices of the Supreme Court of New Jersey:

This matter is before the Board based on one presentment filed by the District V Ethics Committee, as well as four presentments and a recommendation for a private reprimand filed by the District X Ethics Committee. The District V presentment details respondent's failure to zealously represent clients, as well as his neglect of those clients. The matters heard by the District X Ethics Committee concern conflicts of interest and a pattern of self-dealing by respondent to the detriment of the clients involved.

The various cases before the Board may be summarized as follows:

*District V*

*DRB 81–269*

The District V Ethics Committee heard the complaints of three individuals. One of those matters (Gabowsky) was dismissed by the Committee. The remaining two complaints were sustained.

## STIFF MATTER

Leonard Stiff retained the respondent to obtain child visitation rights in December of 1977.  A $600 retainer was paid.  The complainant charged that respondent's services consisted of writing one letter to complainant's ex-wife, and, further, that respondent failed to advise him of the status of the matter.  Additionally, respondent did not follow through on his early 1980 agreement with Mr. Stiff to refund a portion of the retainer.

The respondent claimed that he had prepared and filed with the Court affidavits and notices of motion in this case, and had performed other services for his client.  Although respondent agreed to submit copies of these documents to the Committee, this was never done.  More than one month following conclusion of the ethics hearing in May of 1981, the Committee did receive a copy of a letter from the complainant to respondent which indicated settlement of their dispute, receipt by Mr. Stiff of $400 from respondent, and an indication that Mr. Stiff wished to withdraw his complaint.  Withdrawal was not accepted by the Committee.

## MELWANI MATTER

Prakash T. Melwani, a New York businessman, retained the respondent in August of 1980 to represent him in an action against two airlines.  A $750 check for costs of litigation was given to the respondent, who was to file suit in New York during the next week.  Thereafter, Mr. Melwani, who was unable to reach the respondent directly, was assured repeatedly by respondent's secretary that suit had been filed and that he would receive copies of all papers filed.  In fact, respondent, who was not admitted to practice law in New York, never filed suit on Melwani's behalf.

By October, Melwani had retained New York counsel to obtain the file and retainer from respondent and to pursue the airline suits.  Melwani continued to seek the return of his property, and, to that end, directed a Telex to the respondent in

London, threatening to file an ethics complaint. The respondent then called Melwani, requesting additional time. He promised to meet with Melwani on October 20, 1980, but failed to keep that appointment. This ethics complaint was then filed.

The respondent contended that he agreed only to refer Melwani to a New York attorney, not to take his case. He claims that he cashed the $750 check and delivered the case and the file to the New York attorney's office, leaving both with a person who shared space with that attorney. Respondent claims to have discussed the Melwani matter with this New York attorney, and to have advised Melwani that the New York attorney required a $5,000 retainer. The respondent claims that he then asked an employee of L. B. T., a company that also shared space with the New York attorney, to return the file and money to Melwani, and then respondent left for Europe. On his return he learned of the ethics complaint. The L. B. T. employee who had been asked to return the items to Melwani had left the company in the interim. Respondent claimed that the file was located in the company's offices but Melwani refused to pick it up. Melwani denied the respondent's claims. The file was returned to Melwani by an executive of L. B. T., who advised that he had received the file on February 11th. The money was not returned to Melwani.

As to the *Stiff* and *Melwani* matters, the Committee found that respondent had neglected both clients, and therefore determined that he had violated *DR* 6–101. The Committee further concluded that respondent had violated *DR* 7–101(A)(2) and (3), in that he had failed to carry out his contracts of employment with both Stiff and Melwani, and had thereby prejudiced his clients. The Committee further noted respondent's violation of *DR* 1–102(A)(1), (5) and (6). Additionally, the Committee determined that the respondent does not maintain a bona fide office for the practice of law in New Jersey, and is therefore in violation of *R.* 1:21–1(a).

*District X*

*DRB 80–158* (Kolbek Complaint)

The respondent was approached by Andrea Chalmers, a former client, in December of 1976 to assist her in the marketing of old films inherited by her which were then in storage in Honolulu. Correspondence forwarded from Chalmers to the respondent dated January 12, 1977 describes respondent as Chalmer's "exclusive agent and attorney in law and in fact" who is to "perform any lawful act on (her) behalf". Several days prior to sending that correspondence, on January 8, 1977, Chalmers entered into an agreement with Packord Associates, Incorporated, whereby Packord obtained licensing rights to the various films involved. By agreement dated January 14, 1977 between Chalmers and Packord, a second company, Amity Productions, was given the authority to inspect and market the films, ultimately paying to Chalmers a total of $17,160,000. Of that Packord was to receive $3,000,000.

Packord Associates was comprised of 3 principals, with equally divided interests. The respondent was one of those three principals, together with one John T. Ford and Frank T. Kolbek. During 1977, Kolbek was the only principal to invest monies in furtherance of the Packord venture. To that end, Kolbek made various payments totalling $35,041 to the respondent. During the ethics hearing, respondent admitted receiving approximately $34,000 or $35,000 from Kolbek. (T–13, 9/26/79)

The initial understanding between Chalmers and Packord called for immediate payment of $12,000 to Chalmers upon the execution of the January 8th agreement. The funds were to come from the funds paid by Kolbek to respondent. That full payment was never made, and Chalmers received only $1,000.

The situation was complicated in the Spring of 1977 by the alleged theft of the bulk of Chalmers' films from the Hawaiian warehouse. Chalmers then returned to New Jersey to renegotiate the agreement thereby adjusting the parties' equity positions in order to arrange for the institution of suit against the

insurance carrier for the Hawaiian warehouse. A dispute over percentage of recovery thereafter arose, and Chalmers then requested an accounting on July 29, 1977. An accounting was not supplied and she removed her file from respondent's office.

Although respondent claimed that his secretary, Miss Kerr, kept complete accounting records of the monies involved, Kerr testified that she neither made disbursements of the Packord funds nor kept any records of such disbursements. She was not aware of any ledger cards or other records kept on that account.

The Committee found that although respondent had an obligation to account for the funds received he had failed to do so. He did not keep any detailed records as required by the Disciplinary Rules. Additionally, respondent's personal interest in the Packord Company and its marketing of the Chalmers films differed substantially from his client's interests. The Committee concluded that respondent had thus violated DR 5–104(A) and 9–102.

### DRB 81–271 (Erm complaint)

Harold G. Erm retained the respondent to represent him in a District Court matter in which Erm was the defendant. A default was entered on October 24, 1978 due to the non-appearance of both Erm and the respondent. The respondent testified during the ethics hearing that his failure to appear was the result of an error in the notice of trial. However, by Certification annexed to a motion to vacate that default (P. 6) filed by respondent with the Court on November 8, 1978 (P–3), the respondent advised the Court that it was his error which resulted in his failure to appear on October 24th. That motion was not heard until March 14, 1979 because of an error of the Clerk's office. However, the respondent did not pursue this with the Clerk's office. On March 14, 1979, judgment in the amount of $2,553.60 was entered against Erm. His bank account was levied against later that Spring pursuant to that judgment. Until his bank account was levied against, he had no knowledge and was not advised by respondent of the default. The respon-

dent took no action on his client's behalf until September 21, 1979 when he filed a motion to vacate the judgment. The judgment was vacated, at which point Erm retained other counsel and eventually concluded the matter to his satisfaction.

The Committee found that the respondent's testimony in this matter was contradicted by documentary and testimonial evidence, and concluded that his testimony was not credible. The Committee found that the respondent's conduct in his representation of Erm "was haphazard and evidences an ambivalence towards protecting the interests of his client".

In addition to the above, and during the time that respondent was representing Erm in the District Court case, Erm at respondent's behest agreed to lend $4500 to another client in return for a note and deed on that client's house. Respondent had an agreement with that client to receive a 2% finders fee on the funds to be loaned, unbeknownst to Erm. A check for $4500 was given to the respondent, and in return Erm and his wife received a piece of paper stating "Received $4500" signed by respondent. Erm stated that he was not properly advised by respondent of his rights or that he should seek independent legal counsel concerning the loan.

Testimony before the Committee from the complainant and respondent differed extensively at this point. The Committee noted, however, that in this case the respondent's testimony with regard to the disposition of Erm's money was more credible than Erm's. It therefore appears that respondent did not disburse the $4500 to the intended client. Rather, the bulk of that money was returned to Erm via two checks aggregating about $4300. Erm then returned the money to one Restuccio, to whom he had been introduced by respondent, for investment in what has been termed the Dee Deb matter. The respondent was already involved in the Dee Deb action, and, further, had a claim for legal services rendered to Dee Deb while acting as its attorney. Additionally, he had an existing business relationship with Restuccio.

The Committee concluded that in addition to denying his client the effective assistance of counsel, respondent had financial interests in conflict with those of his client, and had acted in an manner which violated *DR* 1–102(A)(4) and (6), *DR* 5–104(A) and *DR* 7–101(A)(1) and (3).

*DRB 81–272* (Kryspin Complaint)

The respondent had a long standing attorney-client relationship with Alfred Kryspin. Prior to 1977, the respondent, by his own admission, represented the complainant on fifteen to seventeen occasions. Early in 1977, the respondent borrowed three bars of silver from Kryspin. Following that incident, respondent admits that he again represented Kryspin on at least one occasion after borrowing the silver bars. Despite repeated requests, the respondent has failed to return Kryspin's property to him.

It was the respondent's position that since he had not represented Kryspin for approximately 3 months prior to the silver transaction, an attorney-client relationship did not exist. Although he had on many prior occasions borrowed from Kryspin, he would do so only "in between cases".

The respondent never advised Kryspin to seek other advice regarding the loan of the silver bars. Kryspin testified that he considered the respondent to be his attorney at the time of the loan. Additionally, Kryspin gave him the bars, which belonged to his 3 children, because he "trusted him and he was an attorney".

Testimony before the Ethics Committee demonstrated that this loan was not an isolated occurrence. Kryspin became involved at the suggestion of the respondent in a number of other transactions which usually resulted in a loss of money to Kryspin. In one instance, respondent introduced Kryspin to one Novak, to whom he loaned $2,000 which was never repaid. The paperwork was in the name of one Restuccio as lender. (Restuccio was also involved in the *Erm* matter, DRB 81–271.) Kryspin was further enticed by respondent into several other loan situa-

tions, including involvement with shares of a Brazilian stock and loan of a credit card to respondent for his use.

The Committee concluded that a continuing attorney-client relationship existed between Kryspin and Paglianite during the time of all of these loan transactions in which the respondent, acting as a middleman, involved Kryspin. The Committee further found that the respondent violated DR 1–102(A)(6) by taking advantage of his relationship with his client in order to obtain a pecuniary benefit and by engaging in conduct which made it impossible to advise and represent his clients, and DR 5–104(A) by entering into business transactions with a client who has differing interests where the client expected him to exercise his independent professional judgment on the client's behalf.

*DRB 81–273* (Pettineo Complaint)

Joseph Pettineo retained respondent in 1974 to represent him and his corporations, Super Quality Oil Company and Custom Oil Company, which were experiencing problems with the Internal Revenue Service. The respondent thereafter suggested that complainant acquire Kanek Tool Company, owned by one Patrick Kelly, apparently so that complainant and his corporations could benefit by certain tax losses incurred by Kanek Tool. Although complainant alleged that he subsequently learned that the respondent had a personal financial interest in Kanek Tool and represented Patrick Kelly and/or Kanek Tool at the time he suggested the acquisition, no proof of that interest or that representation was introduced at the ethics hearing. The complainant testified that his agreement with Paglianite included the respondent individually as a partner, and named him as trustee for complainant and his companies.

Following respondent's suggestion, Pettineo, his corporations and family members began advancing funds for the purchase and operation of Kanek Tool through respondent. A total of $675,761 was advanced to respondent for Kanek Tool by these sources.

Several attempts were made to obtain an accounting of the funds from respondent. The respondent refused to supply such an accounting to complainant, refused to make various documents available to an attorney retained by respondent, and refused to provide that attorney with an accounting.

The Committee determined that although the evidence submitted suggests that moneys were diverted by respondent from his trust account, and further suggests that a fraud may have occurred, clear and convincing proof of such fraud or diversion was not available, since respondent did not make the records available. The Committee did conclude, however, that respondent, in refusing to account for money entrusted to him as an attorney, violated the Disciplinary Rules.

*DRB 81–274* (McNair Complaint)

The respondent was retained to represent Elizabeth McNair in an action to determine to whom life insurance benefits should be paid on a policy which insured the life of Ophelia Harris McNair, wherein the complainant was named as beneficiary. The complainant claimed that the respondent failed to appear in Court on the date the case was assigned for trial, and further failed to insure that another attorney would appear on her behalf to advise the client of her rights and remedies. The Committee found that although respondent was aware of the trial date and informed his client of that date, he nonetheless failed to appear for trial. The testimony of the respondent was inconsistent in that he agreed generally that an attorney of record must appear or send an associate to appear for trial of a case. However, he claimed that he had discharged his duty as an attorney to Ms. McNair, and "the fact that someone may not have been there was not his fault".

The Committee concluded that the respondent had violated *DR* 7–101(A)(1), (2) and (3), and merited a private reprimand for this act. The matter was not docketed for review by the Disciplinary Review Board until the many cases open with various District Committees at that time were also ready for review by the Board.

Service of notice of hearing before the Disciplinary Review Board was attempted by Regular and Certified Mail on the respondent at five separate addresses, which included the respondent's sister's home in Pennsylvania, an address in Texas, and in care of respondent's ex-secretary, Maria Scime. Notices to Ms. Scime and respondent's sister were not returned and receipt is therefore presumed. Prior to the scheduled hearing, respondent's sister called the offices of the Secretary of the District V Ethics Committee and advised that respondent was too ill to be bothered with the ethics matters. On the day before the Board hearing, Ms. Scime contacted Andrew Clark, Esq. to appear on behalf of the respondent. Mr. Clark appeared before the Board on the day of hearing and advised the Board that he did not represent the respondent in these matters, had not discussed any of the matters before the Board with the respondent, had nothing to add to the existing record and had in fact only spoken with the respondent once in December by telephone, at which time the respondent requested that Mr. Clark represent him in what he claimed was a pending ethics complaint. Mr. Clark stated to the Board that he agreed only to look into the matter for respondent. His investigation has revealed that the matter in question has been heard at the District level, that respondent failed to reply to any of the Committee's inquiries and that the matter would not be reopened by the Committee. Mr. Clark further advised the Board that he had concluded not to represent respondent in that case.

Based upon these representations, the Board excused Mr. Clark from any further participation in this disciplinary matter. The Board was advised by the District Committee representatives, and notes for the Court's information, that Mr. Clark's experience is not unique. It is apparently the respondent's habit to be inaccessible to the Committees, to secure representation at the last possible moment, to then attempt to secure adjournments, and to fail to appear at scheduled hearings.

At the conclusion of the Board hearing, the Disciplinary Review Board was advised that in many of these matters, the information available to the Committees appeared to be just the tip of the iceberg with regard to the respondent's improper activities, but that the documentation necessary to prove the ethics violations was either unavailable or did not meet the "clear and convincing" standard of proof. In addition, the Board was advised that prior to pursuing several of the ethics complaints and in response to the respondent's claim that State and Federal investigations would suffer if he should testify in his own defense, members of the District X Ethics Committee checked with the Federal Bureau of Investigation and the State Police, and were advised that there was no reason to defer action on the ethics complaints.

## CONCLUSION AND RECOMMENDATION

Upon a review of the full record, the Board is satisfied that the conclusions of the District V and District X Ethics Committees as to all matters are fully supported by clear and convincing evidence. The Board further finds that respondent's representations of both Erm (DRB 81–271) and Kolbek (DRB 80–158) violated *DR* 5–101(A) in that the exercise of respondent's professional judgment was clearly affected by his financial and business interests.

The Board notes that it has considered its prior Decision and Recommendation involving this respondent in Docket No. DRB 79–81, which is pending with the Court, in arriving at its recommendation of penalty to be imposed. That Decision details respondent's involvement in a usurious loan transaction between two clients without disclosure of the possible conflicts of interest inherent therein. Additionally, respondent, while representing one of those clients, solicited and received a personal loan from that client. Furthermore, the Board's Decision points out respondent's failure to comply with *R.* 1:21–6, as well

as instances of commingling of funds in his trust account. The Board concluded that respondent had violated *DR* 1–102(A)(4) and (6), *DR* 5–105(A) and *DR* 9–102.

The complaints against the respondent demonstrate a pattern of willful neglect, self dealing and misconduct which establishes without question the respondent's absolute disregard for the duties and responsibilities of an attorney-at-law of this State. The respondent's conduct with regard to the local Ethics Committees further confirms this conclusion. Indeed, the respondent, through his various manipulations of funds gleaned from various clients for his own business dealings, and occasionally for the presumed benefit of other clients, resulted in almost every instance in significant detriment to the client involved. The cases represent attempts by the respondent to "appropriate his (clients') money to his own purposes". *In re Wolk,* 82 *N.J.* 326, 335 (1980). To paraphrase *Wolk, supra* ; the Board "... will no more tolerate the hoodwinking of helpless clients out of funds in a business venture that is essentially for the benefit of the lawyer than it will tolerate outright misappropriation of funds", at 335.

The Board is therefore unanimous in its recommendation that the respondent be disbarred. Additionally, the Board recommends that the respondent be immediately temporarily suspended from the practice of law.

The Board further recommends that the respondent be required to reimburse the Administrative Office of the Courts for appropriate administrative costs, including production of transcripts.

DATED: February 9, 1982

DISCIPLINARY REVIEW BOARD

By:   A. Arthur Davis, 3rd

A. Arthur Davis, 3rd
Chairman