704 A.2d 921

IN THE MATTER OF PETER B. SILVIA,
AN ATTORNEY AT LAW.

Argued September 9, 1997—Decided January 9, 1998.

*Nitza I. Blasini*, Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Peter B. Silvia* argued the cause *pro se*.

PER CURIAM.

This matter arises from a grievance filed with the District XIV Ethics Committee by Warren Wilbur III, Esq., against respondent, Peter B. Silvia. The Office of Attorney Ethics (OAE) filed a complaint charging respondent with violations of *RPC* 1.15(b) (failure to safeguard client funds) and *RPC* 8.4(c) (conduct involving dishonesty, fraud, deceit, and misrepresentation). The complaint charged respondent with knowingly misappropriating trust fund disbursements for the benefit of his wife's cousin, Allen C. Graveley.

The Special Master found that respondent had an attorney-client relationship with Graveley, and that he knowingly misappropriated funds entrusted to him in the course of that attorney-client relationship. The Special Master observed that even if respondent was not acting as Graveley's attorney he knew that Graveley was physically and psychologically ill and completely dependent on respondent to handle his financial affairs. The Special Master determined that respondent had a fiduciary obligation to handle Graveley's finances with the care he would have used in handling the finances of a client or an unrelated third-party.

The Special Master found that respondent did not have authority to withdraw funds from an account containing Graveley's trust fund income. The Special Master noted that, even if Graveley had authorized respondent's withdrawals, respondent knew that Graveley lacked the capacity to do so. The Special Master found that respondent's conduct constituted knowing use of client funds without authorization in violation of *RPC* 1.15(b), and dishonesty, deceit, and misrepresentation in violation of *RPC* 8.4(c).

The Disciplinary Review Board (DRB) sustained the Special Master's finding that respondent's conduct constituted a knowing misappropriation of Graveley's funds in violation of *RPC* 1.15(b) and *RPC* 8.4(c), and a majority of the DRB voted to disbar respondent.

Based on our independent review of the record, we are persuaded that the evidence clearly and convincingly establishes that respondent knowingly misappropriated funds from Graveley.

-I-

The charges against respondent, who was admitted to the bar in 1977, stemmed from his conduct in handling the income of four trusts that were created for the benefit and support of his wife's cousin, Allen C. Graveley. Of relevance to those charges is the allegation that Graveley was incompetent and, therefore, unable to handle the trust funds on his own. Respondent denied throughout the proceedings that Graveley was incompetent. Moreover, he claimed that he did not have an attorney-client relationship with Graveley.

The four trust accounts created for Graveley's support were administered by the Crestar Bank and the Riggs National Bank, both in Washington, D.C. The record does not disclose the precise date when Graveley first began receiving income from those trusts, although, beginning at least as early as 1983, the trust fund income was sent to respondent for Graveley's benefit. Presumably around the same time, and purportedly at Graveley's request, Graveley and respondent established a joint checking account at the Midlantic National Bank into which Graveley's trust fund checks were deposited. From June 1990 to February 1992 the Crestar and Riggs banks sent Graveley checks totaling in excess of $90,000.

The decision of the DRB summarized the relevant evidence as follows:

> Graveley was admitted to the Briarleaf Nursing and Convalescent Home ("Briarleaf") in Doylestown, Pennsylvania, in December 1990. At the time he was forty-one years old. He died at Briarleaf on February 24, 1992. Respondent signed the Briarleaf agreement of admission form as the "responsible party" for Graveley. In this capacity, respondent was required to promptly pay Briarleaf for any services incurred by Graveley that were not otherwise covered by alternate forms of insurance....
>
> ....

The admission form and discharge summary indicated that Graveley was in the "end stage of renal disease" and had a history of psychiatric disorders from alcohol abuse. The discharge form also indicated that Graveley was suffering from schizophrenia. [F]or unknown durations, Graveley had been committed to both Marlboro Psychiatric Hospital in the 1980s and Greystone Psychiatric Hospital as a teen.

. . . .

Graveley required a great deal of assistance in his day-to-day life. Initially, Graveley's uncle provide[d] the assistance. When the uncle became too old, respondent began caring for Graveley. According to respondent, he and Graveley had a verbal agreement [entered into while Graveley was living independently and prior to Graveley's admission to Briarleaf] that respondent was to pay himself $500 per week for services to Graveley and that, if respondent needed additional funds, he could take them, albeit only with Graveley's permission.

The grievant in this matter, Warren Wilbur, was the attorney for Briarleaf. Wilbur testified that respondent's payments to Briarleaf for Graveley's care were always in arrears. As Briarleaf's attorney, Wilbur contacted respondent on numerous occasions in an attempt to recover payment for Graveley's outstanding nursing home bills. Over the course of several months, he spoke to respondent approximately six to ten times and sent respondent several letters. During these conversations, respondent represented himself as Graveley's attorney and repeatedly informed Wilbur that Graveley had insufficient funds to pay the bills. Respondent never disclosed to Wilbur the existence of the trusts of which Graveley was a beneficiary.

Subsequently, Wilbur notified respondent that he intended to sue respondent personally for the arrearages. According to Wilbur,

[respondent's] vehement answer to me was that he had always represented Allen Graveley in the capacity of his attorney, that he had no personal liability whatsoever from this bill, ad infinitum. He kept playing that role, he was always Allen Graveley's attorney and he didn't have any personal liability.

. . . .

Wilbur sent a letter to respondent requesting information about Graveley's estate, including all information about his assets. Respondent replied on his attorney letterhead, indicating that there was a balance of $7 in Graveley's checking account. Respondent attached only the last page of the bank statement for the account at Midlantic National Bank in the name of "Allen Clark Graveley, Jr. or Peter B. Silvia." Respondent also furnished information about Graveley's trusts and their locations.

Upon receiving that information, Wilbur began an investigation and obtained copies of all deposits, checks (front and back) and bank statements from July 1990 to July 1992. Wilbur determined that, during that time period, deposits in the amount of $117,747.64 had been made, primarily from Graveley's trust funds. . . . During that same time, respondent had written checks to himself in the amount of $58,350 and had written and endorsed a number of checks to cash, totaling $15,560. Eleven miscellaneous checks to physicians amounted to $5,317.64. Finally, [Charles] Bingham, Graveley's uncle (respondent's wife's father), received a check

for approximately $2,000. Checks to Briarleaf totaled $37,087.55 and several other payments were made to the provider of Graveley's dialysis. Two checks were written on the date Graveley died, one for $10,000 made payable to respondent and the other to Bingham for $1,100.

Wilbur also received a photocopy of a November 18, 1983 letter, purportedly written by Graveley to one of the banks that administered two of the trusts. The letter indicated that Graveley's "inheritance" was to be sent to respondent, his "lawyer."

. . . .

[T]he OAE conducted an investigation of respondent's actions. A demand audit letter was sent to respondent on August 3, 1993 requesting, among other things, the production of all bank statements, canceled checks, check stubs, deposit tickets and correspondence pertaining to accounts held jointly in respondent's and Graveley's names and any accounts held in trust for Graveley.

OAE Chief of Investigations Gerald Smith testified at the ethics hearing. According to Smith, respondent claimed that he had no records pertaining to Graveley because he had destroyed them all once Graveley died. Respondent also contended that there was no attorney/client relationship between himself and Graveley. . . . Respondent asserted that, although Graveley's gross motor skills were poor, he was certainly competent. Respondent admitted, though, that Graveley had bizarre mannerisms.

As to the checks drawn on the joint account, respondent claimed that he had cashed the checks made out to "cash" and that he had turned over the monies to Graveley. At the ethics hearing, however, respondent claimed that, after the demand audit, he spoke to some relatives and recalled that a portion of the cash had also been distributed to Graveley's mother, who was confined to another nursing home and, to Bingham to reimburse him for expenditures made in Graveley's behalf. Respondent also asserted that, each time he visited Graveley, he gave him large amounts of cash, usually about $200. Respondent added that, on occasion, he would also mail money to Graveley. Respondent testified that he never inquired why Graveley needed such large sums of money.

Respondent also testified that the $500 checks he had written to himself were remuneration for services rendered to Graveley. No documents, however, supported such a contention, nor was such an arrangement ever memorialized. According to Smith, respondent claimed that Graveley had expressed his desire that respondent's wife be given a gift of $10,000. Respondent, therefore, drafted a check to himself in that amount on the day Graveley passed away.

Smith performed an accounting of the joint bank account from December 1990 to February 1992 and concluded that while Graveley was at Briarleaf, respondent wrote checks to cash in the amount of $12,150 and to himself for $45,300. Smith's review of respondent's attorney trust and business accounts also revealed that respondent failed to comply with R. 1:21-6.

During the OAE audit, respondent claimed that he visited Graveley at Briarleaf approximately once every week, that he always entered the nursing home through the loading dock and, therefore, never signed into the facility, never ran into any nursing home personnel and never spoke to any of the personnel.

A number of Briarleaf personnel testified at the ethics hearing [and] [t]heir collective testimony painted a picture of Graveley as an unkempt individual with poor motor skills, poor vision, violent episodes, mood swings, and, on occasion, animalistic mannerisms, including barking like a dog. The consensus was that Graveley was incapable of living on his own or managing his own affairs; he could be calm one moment and shouting and throwing things the next.

. . . .

Briarleaf employees testified that they had never seen [respondent] at the facility. One of the witnesses suggested that it would have been impossible for respondent to visit Graveley once a week for fourteen months and never run into any staff, particularly since the employees were constantly in and out of the residents' rooms. . . . The employees recalled that Graveley's only visitors were Graveley's acquaintances from Alcoholics Anonymous and Graveley's uncle. Finally, none of the employees had ever seen more than a few dollars in Graveley's possession. Similarly, the woman in charge of opening the residents' mail did not recall that anyone had ever mailed cash to Graveley.

. . . .

Respondent testified that Graveley was not incompetent. He admitted, however, that while Graveley lived on his own, he "needed everything done for him." Respondent claimed that he had "put his life on hold" by taking care of Graveley's day-to-day necessities. For example, respondent disclosed that he did Graveley's laundry, walked his dog, cleaned his apartment, installed his air conditioner, took out his trash, took him to Alcoholics Anonymous meetings and essentially did anything and everything that Graveley wanted. Respondent asserted that those tasks were not the type of services rendered in connection with an attorney/client relationship.

. . . .

As to the $10,000 check written on the date Graveley died, respondent claimed that he had Graveley's permission to issue it. Respondent contended that Graveley had wanted to make a gift to respondent's wife, who was Graveley's cousin. Respondent denied being aware that Graveley died on the same date, even though he knew that Graveley was near death. Respondent testified that he had made the check out to himself, rather than to his wife, and then cashed it. He stated that he deposited the check in an account other than the joint account he shared with his wife. Although respondent's wife claimed that she was aware that Graveley had wished to give her a gift, it was not clear from the record that she knew the amount of the gift or when or where it had been deposited.

With regard to the $1,100 check made out to Bingham on that same date, respondent maintained that, while he did not know of Graveley's death on that day, the check might have been intended to reimburse his father-in-law for the expense of Graveley's cremation or for other expenses. Bingham passed away before the ethics hearing.

Respondent contended that he failed to notify the banks of Graveley's death because he had trouble coping with the death. Eventually, the Crestar Bank learned of Graveley's death through another relative.

A letter from a Crestar Bank trust officer about Graveley's estate indicated that the bank had not learned of the death until September 1992, more than six months after his death. The bank, therefore, was required to make a demand for the return of the checks it had issued in July and October for the two trusts it administered for Graveley. A stop payment order was placed on the checks, which had already been mailed to respondent, and the amounts were credited back to the trusts. Respondent conceded that the remainder of the funds in the trust would pass to the Clark–Ginsberg line of heirs (possibly Graveley's stepmother and her family), not the Bingham line. Respondent also admitted that he knew that, if Graveley had been declared incompetent, he might not have been appointed to handle Graveley's funds. Presumably, respondent was referring to the fact that he was not Graveley's next-of-kin.

Our independent review of the record leads us to concur with the DRB's findings of fact and with its conclusion that disbarment is the appropriate discipline.

-II-

Misappropriation is the "unauthorized use by the lawyer of client's funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." *In re Wilson*, 81 *N.J.* 451, 455 n. 1, 409 *A.*2d 1153 (1979). *Wilson* established the general rule that lawyers who misappropriate clients' funds invariably will face disbarment. *Id.* at 453, 409 *A.*2d 1153. Mitigating factors rarely will override the requirement of disbarment. *Id.* at 461, 409 *A.*2d 1153.

Respondent contends that he never held himself out as an attorney representing Graveley. Further, he argues that the tasks he had performed for Graveley were not characteristic of work ordinarily performed by attorneys: "Attorneys don't walk dogs, attorneys don't pick up people, attorneys don't buy clothes for him when he's in the nursing home, attorneys don't be liaisons, attorneys don't do lots of things like this."

The DRB concluded that respondent consistently described himself as Graveley's attorney. The DRB based that conclusion on Wilbur's testimony that respondent repeatedly told Wilbur that he was Graveley's attorney and therefore had no personal liability

for Graveley's nursing home bills. The DRB also relied on a letter from Graveley himself, instructing the banks to send checks from his trusts to respondent, his lawyer. Additionally, the DRB relied on letters from the banks to respondent in his capacity as Graveley's attorney. The evidence clearly and convincingly establishes that respondent held himself out to others as Graveley's attorney and that there was an attorney-client relationship between respondent and Graveley. Respondent does not contest the evidence demonstrating that he wrote checks from Graveley's trust funds to himself in the amount of $58,350 and endorsed a number of checks payable to cash totaling $15,560. Respondent contends, however, that he was authorized by Graveley to write the checks to cash and to himself. He asserts that Graveley insisted on paying respondent $500 weekly, but that after Graveley entered Briarleaf there were no "relationships or job duties ascribed to this money paid to me." Additionally, he argues that Graveley was not incompetent, although respondent admitted that Graveley was incapable of caring for himself.

Graveley had a history of psychiatric problems and had spent periods of time in psychiatric institutions. Briarleaf employees and Graveley's treating physician testified that Graveley engaged in unusual behavior and was not competent to manage his affairs. They testified that Graveley swore, screamed, and frequently exhibited bizarre behavioral traits. Graveley's treating physician testified that Graveley was unable to make reasonable decisions and could therefore be easily victimized by others. Relying on this evidence, the Special Master found, and the DRB agreed, that Graveley lacked the capacity to make a binding oral agreement, and that respondent knew that Graveley lacked that capacity.

We find no reason to disturb that finding. There is no persuasive evidence that Graveley authorized respondent to withdraw funds. Even if Graveley had authorized those withdrawals, respondent was aware of Graveley's history of psychiatric illness and bizarre behavior, and knew that Graveley was incompetent to

authorize respondent to pay himself exorbitant fees while performing virtually no services.

In addition to finding that respondent had misappropriated client funds, the Special Master found that respondent's conduct involved dishonesty, fraud, deceit, and misrepresentation in violation of *RPC* 8.4(c). "Respondent's conversion to his own purposes of funds entrusted to him by a relative with diminished capacity is itself a deceitful act." In addition, respondent continued to pay himself $500 per week even though he had admittedly ceased performing services for Graveley. Moreover, Briarleaf bills were overdue and respondent misrepresented the amount of money available to pay those bills. As a result, Graveley had to forgo medical and psychiatric treatment and placement in a private room. Finally, although respondent claimed that Graveley wanted to give a gift to respondent's wife, on the day Graveley died respondent wrote a $10,000 check to himself and deposited it in an account to which his wife had no access.

The DRB found respondent's conduct similar to the "hoodwinking of helpless clients" that this Court condemned in *In re Wolk*, 82 *N.J.* 326, 335, 413 *A.*2d 317 (1980). We agree with the Special Master and the DRB that such conduct constitutes dishonest and deceitful acts in violation of *RPC* 8.4(c).

We cannot avoid the conclusion that respondent knowingly misappropriated substantial amounts from Graveley's trust funds. Not only was Graveley a client, he was also a family member who trusted respondent to tend to his financial affairs because he was physically and mentally incapable of doing so himself. Knowing misappropriation of funds from a family member incapable of self care by a lawyer-relative entrusted with the safekeeping of those funds for the family member's benefit constitutes a flagrant abdication of the lawyer's professional responsibilities. No discipline short of disbarment is justified.

Respondent is disbarred. He is to reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

*For disbarment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.

### ORDER

It is ORDERED that **PETER B. SILVIA** of **WASHINGTON,** who was admitted to the bar of this State in 1977, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that **PETER B. SILVIA** be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by **PETER B. SILVIA,** pursuant to *Rule* 1:21-6, be restrained from disbursement except upon application to this Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of the Superior Court who is directed to deposit the funds in the Superior Court Trust Fund, pending further Order of this Court; and it is further

ORDERED that **PETER B. SILVIA** comply with *Rule* 1:20–20 dealing with disbarred attorneys; and it is further

ORDERED that **PETER B. SILVIA** reimburse the Disciplinary Oversight Committee for appropriate administrative costs.