IN THE MATTER OF LEON S. WOLK, AN ATTORNEY
AT LAW.

Argued December 11, 1979—Decided April 3, 1980.

*Richard J. Engelhardt*, Staff Attorney, argued the cause for the Disciplinary Review Board.

*Leon S. Wolk* argued *pro se*.

PER CURIAM.

Respondent's conduct is before this Court on two unrelated complaints. In one, respondent attempted to commit a fraud on a federal district court and his clients in order to secure a larger legal fee than that to which he was entitled. In the other, he represented his client in a business matter in which he was personally involved. He counselled her to make a hopeless investment in a building in which he had an interest, and concealed material information from her, including the fact of a foreclosure and sheriff's sale on that building.

The attempted fraud—a gross intentional exaggeration of services rendered—was outrageous. The deceit and exploitation of a helpless, recently widowed client was inexcusable. The Disciplinary Review Board recommended disbarment. We agree.

## WALKER MATTER

This matter arose during a personal injury suit in federal court in 1973 and 1974. The suit arose from an incident in which a 400-pound steel beam was dropped from a truck, crushing an eight-year-old boy and permanently paralyzing him from the chest down. The boy's parents retained respondent, on a contingent fee basis, to represent both the child and them. Later, perceiving a possible conflict of interest between the interests of the infant and his parents as to the nature and management of a possible settlement, the district court relieved respondent as the child's attorney and appointed another attorney as guardian *ad litem* for the child. Respondent was distressed with that action, especially its impact on what he had assumed would be a lucrative contingent fee arrangement based on the child's recovery.

Respondent represented the parents at trial. The court-appointed guardian represented the child and served as trial counsel. After a jury had been selected and testimony had begun, defendant's insuror settled the claims of both parents and the child. The child received a gross settlement of $1 million in

cash, plus an undertaking by the insuror to pay all future accident-related medical expenses. The parents received a gross settlement of $177,800.

Following approval of the settlement, the district court directed respondent and the guardian *ad litem* to file affidavits of services so that the court might approve allowance of counsel fees to them from the infant's recovery. This written request was dated June 23, 1975.[1] The district court made it clear that the contingent fee arrangement (which would have resulted in about $130,000 in fees for respondent if, as the record suggests, the schedule in *R*.1:21–7 were applicable) would have nothing to do with respondent's compensation for his services on behalf of the infant, although it did apply to his services for the parents. On August 13, 1975, respondent filed an affidavit in which he claimed a fee of $162,500. This claim was based on an asserted total of 3,000 hours spent on the case, of which 1,522 hours were itemized. The Disciplinary Review Board found that this affidavit contained misstatements of fact and exaggerations as to the quantum and value of respondent's services. For example, during one five-day period in April 1975, respondent claimed he worked a total of over 117 hours as follows:

| Friday | April 11, 1975 | 33¾ hours |
| Saturday | April 12, 1975 | 17½ hours |
| Sunday | April 13, 1975 | 24¼ hours |
| Monday | April 14, 1975 | 20½ hours |
| Tuesday | April 15, 1975 | 20¾ hours |

In addition, respondent asserted that he had spent 160 hours

---

[1]The request provided that the affidavits take into account the factors enumerated in *Lindy Bros. Bldrs., Inc. v. American R. R. Sand Corp.*, 487 F.2d 161 (3d Cir. 1973). These are the amount of time spent at a reasonable hourly value for the particular attorney, the nature of the activity, *id.* at 167, the contingent nature of success (*i. e.*, the likelihood of recovery), and the quality of the attorney's work (bearing on the complexity and novelty of the issues presented, the attorney's work as observed by the judge, and the amount of the recovery). *Id.* at 168–69.

conferring with another attorney in preparing the case, and that this attorney spent 360 hours on related legal research and other matters. However, this other attorney testified to the District Ethics Committee that he had spent 36 hours on the case, and had submitted a statement to that effect to respondent in April 1975. Respondent conceded at the hearing that the other attorney's recollection was accurate.

Respondent also submitted a claim for 150 hours of a paraprofessional's time, specified in the affidavit as consultations as to "economic-actuarial and statistical data" and discussions of "prospective jury profile and exercise of challenges." Respondent provided no written memoranda of such conferences nor any explanation to the Committee beyond a statement that he remembered discussing the case with the paraprofessional. The claim of 150 hours was not only completely unsubstantiated, but respondent had no reason to believe the time spent even approached 150 hours.

Respondent was directed by a court to prepare an affidavit of services. Relying on the contingent fee agreement, respondent had kept no time records other than the occasional note of an appointment. Respondent had, however, 40 days in which to make an honest effort to reconstruct his time from dates on correspondence and court papers, his office diary and the recollections of those with whom he conferred. The affidavit that he submitted shows that he failed to make such an effort. Even given respondent's contention that his affidavit represented an estimate, it is fair to conclude that the affidavit was so recklessly prepared as to amount to a knowing misrepresentation. The misstatements and exaggerations contained in this affidavit show a wanton disregard for an attorney's obligation both to his clients and to the court. See DR1–102(A)(4), (5); DR7–102(A)(5).

Had respondent's fabricated affidavit of services not been subjected to the scrupulous analysis of a conscientious trial judge, respondent might have been paid $100,000 for legal

services he did not perform.[2]  Respondent's contention that he viewed the requested $162,500 as, in effect, compensation for the emotional pain and depression resulting from his replacement as trial counsel and as attorney for the infant plaintiff, is grasping, self-serving and of no relevance to his offense.  *In re McManus*, 75 *N.J.* 238 (1978).  Respondent already knew that he was not entitled to the hoped-for contingent fee.

> The court has the right to rely upon the integrity of its officers.  The legal profession is a confidential one, with a double duty upon its members, viz., utmost good faith toward both client and court.  A lawyer who seeks by trick or by deception to impose upon either his client or the court is unfitted to advise the one or to appear before the other.  He desecrates the temple of Justice.  [*In re Cahill*, 66 *N.J.L.* 527, 530 (Sup.Ct.1901)].

Respondent attempted fraudulently to manipulate the court to enrich himself at the expense of a paralyzed eight-year-old plaintiff.

## HAMBURGER MATTER

Late in 1973, the complainant, a widow, retained respondent as attorney for her husband's estate, valued at approximately $65,000.  Respondent, who had represented the husband during his life, had also been named executor of the estate.  Approximately two months after her husband's death, the widow asked respondent to suggest an appropriate investment for a portion of her inheritance.  Respondent suggested that she invest $10,-

---

[2]Based on its own evaluation of the legal services actually performed, the district court awarded $60,000 to respondent, as compared to the $162,500 that respondent had requested.  From this $60,000, the district court deducted $34,746.66 that the parent-plaintiffs had already paid respondent pursuant to their contingent retainer agreement.  Thus, from the recovery of the infant plaintiff, respondent was awarded $25,253.34.

000 in a second mortgage on a multi-family dwelling [3] in Hoboken owned by the First Fort Lee Mortgage Company. Before closing the loan, respondent informed the widow that he was a stockholder and officer of the Company. It is unclear whether respondent gave her this information when the investment was first discussed or at the point of closing the loan. In fact, respondent owned a 25 percent interest in the First Fort Lee Mortgage Company and was its president as well as its attorney. Respondent testified that he advised the widow to seek independent legal advice before making the loan. The record establishes, however, that she relied solely on his legal representation. Respondent further testified that he counseled her to seek independent investment advice, and the record shows that she did engage in some discussion of the proposed investment with her adult son, then in the children's clothing business.

Respondent prepared the bond and mortgage and closed the loan. The mortgage provided that it would be subordinated to a new first mortgage, not yet obtained and without limit as to amount. Respondent apparently never explained the significance of the subordination provision to his client. Moreover, at no time did he disclose to his client that this building which was the security for her $10,000 second mortgage had been purchased only eight months earlier by his corporation for a total of $8,000, consisting of $5,000 cash and a $3,000 purchase money mortgage, and that 1973 real estate taxes on the property had not been paid. Additionally, he did not conduct a title search, did not provide an affidavit of title in the usual form, and did not reveal the actual condition of the property.[4]

---

[3]The complainant's testimony at the District Ethics Committee hearing indicated that she had the impression that the building was a garden apartment complex. In fact it was a three-story building in a depressed area, consisting of six apartments with one common toilet on each floor. The complainant apparently did not go to look at the building before making the investment.

[4]On contested evidence, the District Ethics Committee found that the market value of the building was $5,000.

In January 1975, respondent's corporation, First Fort Lee Mortgage Company, was sued in a foreclosure action on the property;[5] a deputy sheriff personally served respondent as registered agent for the Company. This deputy also so served respondent as agent for the widow, the second mortgagee, upon respondent's representation that he would accept service for her. Nevertheless, respondent failed to defend the action on her behalf and failed to notify her of his receipt of the summons and complaint. In June, July and August of 1976, complainant telephoned respondent to inquire why she had stopped receiving regular monthly payments on her second mortgage. He assured her that payments would resume shortly. They did not. He did not mention the foreclosure proceeding. In October 1976 complainant retained new counsel. Respondent spoke with him several times between November 1976 and January 1977, and similarly failed to advise him of the foreclosure proceedings. New counsel independently learned that a foreclosure proceeding had been instituted and a sheriff's sale held. He obtained a court order which vacated complainant's default and set aside the sheriff's sale. Subsequently, respondent helped arrange to have each of the four shareholders of First Fort Lee Mortgage Company agree to pay complainant $50 per month until the full debt was satisfied.[6]

Respondent concealed from his client the recent purchase price of the property, its real value, and the fact that taxes were unpaid. It is clear that he had a duty to provide her with this information. *Cf. In re Greenberg*, 21 *N.J.* 213 (1956). Respon-

---

[5]The $3,000 purchase money mortgage was taken by the couple who sold the building to First Fort Lee in April 1973. By September or October of 1974, it was in default. The mortgagees assigned this mortgage to one Peter Dykstra on December 27, 1974. In January 1975, Mr. Dykstra began foreclosure proceedings.

[6]The repayment arrangement was made after complainant filed charges with the District Ethics Committee. It plays no part in our evaluation of respondent's conduct. *Cf. In re Wilson*, 81 *N.J.* 451 (1979).

dent knew that his client was naive and inexperienced in business matters, and that she was relying not only upon his advice but upon his judgment and upon the confidence she had in him based on his past 16 years of service as her late husband's attorney. That he suggested she seek independent advice is of little consequence under the circumstances of this case; he had every reason to believe that she would not do so. Given his client's obvious lack of understanding of the transaction and her failure to grasp the significance of respondent's interest in the company that was to benefit from her money, his suggestion that she seek independent legal and financial advice appears designed to protect him rather than his client. Respondent cannot shield himself behind the glib recitation of a disclosure the practical meaning of which was unknown to his client.

■ Lawyers have a duty to explain carefully, clearly and cogently why independent legal advice is required. When a lawyer has a personal economic stake in a business deal, he must see to it that his client understands that his objectivity and his ability to give his client his undivided loyalty may be affected.

> "An attorney is bound to disclose to his client every adverse retainer, and even every prior retainer, which may affect [his] discretion . . . . No man can be supposed to be indifferent to the knowledge of facts, which work directly on his interests, or bear on the freedom of his choice of counsel. When a client employs an attorney, he has a right to presume, if the latter be silent on the point, that he has no engagements, which interfere, in any degree, with his exclusive devotion to the cause confided to him; that he has no interest, which may betray his judgment, or endanger his fidelity." [*Williams v. Reed*, 3 *Mason* 405, 418 (C.C. Maine 1824) (Story, J.), *quoted in In re Kamp*, 40 *N.J.* 588, 595 (1963)].

Given the widow's total dependence upon respondent, the one-sidedness of the transaction, the financial realities of a $10,000 investment in a building worth perhaps half that sum, any possible advantage in this deal was on the side of the owners of First Fort Lee Mortgage Company. Respondent was one of the

owners as well as president and general counsel of the Company. It is clear that he exploited his client for his own financial benefit. It was unthinkable in the first place for respondent to have suggested such an investment, but, having done so, it was unconscionable for him to have continued to represent the widow. He should have insisted that she retain independent counsel or refused to consummate the transaction.[7] Independent counsel would have made a proper title search, would have discussed the status of second mortgage vis-a-vis first mortgage,[8] would have discovered the unpaid taxes. Tax and title searches would have uncovered the recent purchase price and delinquent tax status. Undoubtedly, independent counsel would never have allowed the widow to make this investment.

Respondent's conduct in this matter was in violation of DR 5-104(A) and DR 5-105(B), which restrict an attorney in entering or continuing a professional relationship that may be in conflict with his own or another client's interests. Nor did respondent's dual role in this sorry affair cease when the loan was closed. His continued concealment and misrepresentations breached his professional obligation to her in violation of DR 1-102(A)(4), (5) and (6). His corporation had obtained and then defaulted upon a purchase money mortgage. Respondent also concealed this situation from his client. When payments on the second mortgage ceased, respondent was able to give her an

---

[7] The complexity of relationships between attorney and client when each has an interest in a business transaction can, in other cases, make the question of when the attorney should withdraw from representation difficult. For example, there is an obvious distinction between this transaction and one where the client is a sophisticated businessman able to rely on his own judgment and experience. *See In re Palmieri*, 76 *N.J.* 51 (1978); *compare In re Hurd*, 69 *N.J.* 316 (1976). However, there is no such difficulty here.

[8] The record does not indicate whether this subject, surely material to the decision to make the loan, was ever mentioned to complainant, other than that she was told that one gets higher interest on a second mortgage than on a first mortgage.

explanation, but he simply refused. The original lie, feeding upon itself, grew until discovery was inevitable.

Had respondent been better able to juggle his financial manipulations and those of his corporation, the second mortgage might have been paid back with no economic loss to his client. This possibility does not alter the fact that during the period the loan was outstanding, respondent would have had, pursuant to a course of concealment and deception, a sum of his client's money at his disposition. This Court will no more tolerate the hoodwinking of helpless clients out of funds in a business venture that is essentially for the benefit of the lawyer than it will outright misappropriation of trust funds. *In re Wilson*, 81 *N.J.* 451 (1979).

## CONCLUSION

In both of these matters respondent's clients had every right to expect honesty and fair dealing. In both of these matters, respondent in effect attempted to appropriate his client's money to his own purposes. "No clearer wrong suffered by a client at the hands of one he had every reason to trust can be imagined." *In re Wilson, supra,* 81 *N.J.* at 456.

Respondent's name will be stricken from the roll.

*For disbarment*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*Opposed*—None.

## ORDER

It is ORDERED that LEON S. WOLK of Woodcliff Lake be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that LEON S. WOLK be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with all the regulations of the Disciplinary Review Board governing suspended, disbarred or resigned attorneys.