684 A.2d 1377

IN THE MATTER OF JOHN P. DOYLE, AN ATTORNEY AT LAW.

Argued September 24, 1996—Decided November 22, 1996.

630

*Nitza I. Blasini*, Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Robert F. Novins* argued the cause for respondent (*Novins, York & Pentony*, attorneys).

PER CURIAM.

This disciplinary proceeding arises out of a presentment filed by the District I Ethics Committee (DEC) against respondent, John P. Doyle, based on his representation of members of the Osborn family. The DEC found respondent guilty of unethical conduct in the preparation of a power-of-attorney, wills, and an estate plan for Kathryn Osborn and in the purchase of property from John Osborn, Jr. The Disciplinary Review Board (DRB) agreed with that finding. A majority (five members) of the DRB recommended respondent's suspension from the practice of law for one year; three members recommended a reprimand. We granted respondent's petition for review.

After independently reviewing the record, we conclude that respondent engaged in unethical conduct. We find, however, that a six-month suspension from the practice of law more appropriately reflects the seriousness of respondent's conduct.

I

Respondent was admitted to the bar in 1967. Until recently, he was engaged in the general practice of law and, from 1974 to 1992, was a member of the New Jersey Assembly. Respondent's prac-

tice is now limited almost exclusively to representation of munici-palities. Numerous letters attesting to respondent's good character and good works have been received. In 1985, respondent was privately reprimanded for a conflict of interest in a real estate transaction.

A

General Relationship with the Osborn Family

The conduct in question stems from respondent's relationship with members of the Osborn family. Respondent met John W. Osborn, III (Jack) in the late 1950's when they attended the same high school. By the late 1960's, respondent began representing Jack in various matters. Later, he represented Jack's wife, Carol. Eventually, respondent performed legal work for Jack's father, John Osborn, Jr. (John), and his wife, Loretta.

Respondent's primary ethical transgressions involve his representation of John's sister, Kathryn Osborn. John and Kathryn had three other siblings, Marion Osborn Wagner, Stanley Osborn, and Bartlett Osborn. Respondent first represented Kathryn when, on the death of her sister Marion in 1978, she became the executrix of her sister's estate. John was named alternate executor and Kathryn was the primary beneficiary of that estate. A significant portion of the estate consisted of real property, known as Camp Osborn, in Brick Township that had an approximate value of $1.8 million. Kathryn and Marion owned the real estate jointly, and Kathryn inherited Marion's share under her will.

On November 24, 1979, Kathryn suffered a severe stroke that rendered her paralyzed on the right side, unable to communicate orally, and confined to a nursing home. After Kathryn suffered the stroke, John retained respondent to help him prepare an application to have Kathryn removed as executrix of Marion's estate. Respondent obtained an affidavit from one of Kathryn's physicians, Doctor Bregman, stating that as a result of her stroke, Kathryn was "unable to take care of herself and certainly any business or estate matters." Dr. Bregman reported that Kathryn

no longer had the physical or mental ability to make decisions and that the condition was irreversible.

Kathryn was removed as executrix on the basis of her incompetence to function in such a capacity. There was no adjudication that Kathryn was incompetent to conduct her own affairs.

## B

### Power–of–Attorney

After Kathryn was removed as executrix, respondent prepared a power-of-attorney for Kathryn's signature, at John's request. The power-of-attorney named John as attorney-in-fact and authorized him to "perform any act or execute any document including checks received or to be paid out, to convey, encumber, dispose or effect any real or personal property owned by [Kathryn]." Respondent did not recall discussing the preparation of that document with Kathryn, but did remember John asking him to prepare the document. Respondent, however, claimed that he was representing Kathryn, not John, in the preparation of the power-of-attorney. Although respondent realized there was a problem with Kathryn's capacity to grant such a power-of-attorney, he proceeded with the preparation of the document for Kathryn's signature. There is no allegation that John misused the power-of-attorney.

Kathryn signed the power-of-attorney with an "X" and it was notarized by respondent's secretary. Although the letter transmitting the document to Kathryn for her signature directed her to execute and return the document to respondent's office for witnessing, respondent assumes that his secretary personally witnessed the signature, as he would have wanted it done that way. Respondent acknowledged the impropriety of notarizing a document signed out of the presence of the notary.

## C

### The 1980 Will

In 1980, respondent prepared reciprocal wills for Kathryn and her husband, James. The record does not reveal at whose behest

respondent prepared those wills. His file did not contain any notes of a meeting with Kathryn or James before the preparation of the wills. Nonetheless, he believes he "must" have met with Kathryn before he prepared the will.

Kathryn's 1980 will essentially provided for the conveyance of "certain properties" (seventeen lots that were part of Camp Osborn) to John in trust. The income from the properties was to be used for the support and maintenance of Kathryn and her husband. On the death of the survivor of Kathryn or James, the income was to be paid equally to John, Stanley, and Bartlett. When the last brother died, the trust was to be terminated and the corpus to be divided between Jack (John's son) and Robert (Bartlett's son). Respondent asserts that Jack's lots were worth $630,800, and that Robert's lots were worth only $265,300. The residue and remainder of Kathryn's property, was devised to John, Stanley, and Bartlett. John was appointed executor and trustee under the will.

The will, dated December 15, 1980, bore the signature of "Kathryn M. Osborn," rather than an "X," and was witnessed by respondent and Dr. Bregman, the same doctor who signed the March 1980 affidavit stating that Kathryn lacked the ability to continue as executrix of Marion's estate. Marion B. Perrine, an employee of the nursing home, notarized the will. Respondent testified that Kathryn signed the will with her own hand. Nursing home employees testified that it was common practice to have a social worker assist patients to sign their names to certain documents.

D

The Estate Plan and the 1985 Will

Although respondent had not seen Kathryn in four years, he engaged a tax attorney and accountant to prepare an estate plan

for Kathryn that would minimize the tax consequences to the beneficiaries of Kathryn's estate, primarily John and his family. Respondent did not visit Kathryn at the nursing home to determine whether she wanted to revise her 1980 will and adopt a new estate plan, but relied on information and representations about Kathryn's wishes provided by John and Jack.

Respondent met with Kathryn to discuss the new estate plan, for the first time, on November 29, 1984. Respondent claimed that he had a "general" discussion with Kathryn regarding the nature of the estate plan and its effect. Kathryn was unable to communicate verbally, but apparently was able to make a few grunting sounds or utter an occasional word or two. Respondent claimed that he discussed the concepts proposed by the tax attorney with Kathryn by asking her only "yes" or "no" questions. Respondent determined Kathryn's wishes after he wrote names and amounts on sheets of paper, pointed to the name or amount and Kathryn responded with a nod or grunt. According to respondent, through this method he was able to determine that Kathryn wanted to leave her brother Bartlett only $5,000 and that she wanted the bulk of her estate to be left first to her husband, James, then to John and ultimately to Jack. Stanley, Kathryn's other brother, had already died. Her husband, James, was the only other individual present during that exchange.

On or about February 27, 1985, Kathryn and her husband signed new reciprocal wills. Kathryn executed her will with a mark, instead of her signature. Her will created two trusts. The first, the spouse's part, was to be held by John as trustee, for the benefit of James during his lifetime; on his death, the corpus was to be added to the second trust, the residual part. The second trust was to be held by John, as trustee, and the income was to go to James during his life. On James' death, the income was to go to John or his wife, and, on the death of the survivor of them, the entire balance of the trust was to be distributed to Jack. James made a reciprocal will.

Respondent did not read the will to Kathryn word for word, but reviewed the provisions in a "general way." Frances Robinson, a friend of John's wife, witnessed Kathryn's signature. Ms. Robinson testified that Kathryn understood the contents of the will: "it was the way she wanted it." She recalled respondent showing and reading parts of the will to Kathryn. Ms. Robinson also remembered respondent asking Kathryn if she understood parts of the will and if "it was the way she really wanted it." Kathryn did not answer "no" to any of respondent's questions. According to Ms. Robinson, it took approximately ten minutes for respondent to review the will with Kathryn.

Prior to the execution of Kathryn's new will, and in accordance with the overall estate plan, Kathryn conveyed to John, Jack, and their spouses income-producing property in Sea Girt, New Jersey, for one dollar. Between December 1984 and February 1987, in furtherance of the estate plan, Kathryn also conveyed outright to John and Jack the "totality" of her real estate holdings. The value of the properties was in excess of one million dollars. Respondent prepared each of the deeds involved in the transfers. He also witnessed Kathryn's mark as her signature on those deeds.

The tax expert recommended that an annuity for Kathryn's support and maintenance should be purchased. John, however, could not afford the annuity payments. Therefore, in May of 1986, Jack, as "borrower," executed a note and mortgage to Kathryn as the "lender," in the amount of $400,000. The security for the "loan" was a piece of property that had been conveyed by Kathryn to Jack. The payment terms were obscure.

Because Kathryn transferred all of her properties during her lifetime, there was literally nothing left, other than the $400,000 note, to form the corpora of the trusts created under the reciprocal wills. James died in May 1986 and Kathryn in October 1987.

After Kathryn's will was offered for probate, in March 1988, Bartlett filed a petition contesting Kathryn's will. The petition alleged that the will and *inter vivos* gifts were invalid, because

Kathryn was not mentally competent and had been subjected to undue influence from John, Jack, and their respective wives.

As the executor of Kathryn's estate, John retained respondent's law firm to oppose Bartlett's claims. Approximately three weeks before the trial, however, respondent's partner sent a letter to John, notifying him of Bartlett's claim that respondent's representation of both Kathryn and the will beneficiaries gave rise to a presumption of undue influence that could only be rebutted by clear and convincing evidence. The letter advised John that, if clear and convincing proof could not be presented, John would have a cause of action against respondent for respondent's actions between 1980 and 1987.

As a result of the letter, John and the other named-defendants in the will contest retained new counsel. The defendants ultimately entered into a settlement agreement with Bartlett, setting aside the will and the *inter vivos* transfers. Bartlett received approximately forty percent of the estate's assets. Thereafter, John filed a malpractice action against respondent and apparently recovered most, if not all, of that amount from respondent's malpractice insurance carrier.

## E

In 1987, respondent purchased property referred to as "Drum Point property" from John and Loretta. That property had been conveyed by Kathryn to John and Loretta on February 13, 1987, for $1, in accordance with Kathryn's estate plan. Six days after the property was conveyed to them, John and Loretta contracted to sell the Drum Point property to respondent for $25,000. Neither John nor Loretta was represented by an independent attorney in the transaction. Thereafter, the property was transferred to a partnership composed of respondent and his two daughters. In arriving at the $25,000 price for the property, respondent stated that he had a sense of the property's worth based on an earlier offer in 1984 of $19,900 that one of his clients made to

Kathryn. Respondent also considered comparable land values in the area.

Respondent testified that he strongly urged John to have the property appraised and obtain independent counsel, but he did not press the issue after John and Loretta failed to act on his recommendations. Respondent believed that John, as a business-person, had the ability to determine whether the price of the property was reasonable. Respondent never discussed his intention to purchase the Drum Point property with Kathryn. He did, however, obtain the following acknowledgment from John and Loretta:

> The undersigned acknowledge that they have been represented by John Paul Doyle, who is under contract to purchase from them certain real property known as Lot 8 in Block 194, located on Drum Point Road, in the Township of Brick, Ocean County, New Jersey.

> The sellers acknowledge that they have entered into the contract freely and voluntarily and have not been advised by [respondent] on the contract. They further acknowledge that they have been independently satisfied that the sale price is a fair one and have not been given any representation, understanding, advice or opinion by [respondent] as to its value.

Shortly after purchasing the Drum Point property, respondent applied for a subdivision approval, which he obtained in mid–1988. Seven or eight months later, respondent sold the property for $110,000 to Jenco Builders, Inc., respondent's client who had offered to buy the property in 1984.

Before the DRB, respondent's counsel stated that respondent was no longer representing Jenco at the time of that sale. According to respondent, his attorney-client relationship with the Osborns, including Kathryn, terminated on February 13, 1987 when she transferred title to the last of her property.

## II

We are satisfied by clear and convincing evidence that respondent was guilty of unethical conduct while representing Kathryn in the preparation of her power-of-attorney, her wills,

and her estate plan. With regard to the power-of-attorney, we find, as did the DRB, that

[r]espondent's action in this regard created a conflict of interest situation because he had represented Kathryn as executrix of Marion's will, had acted (or still was acting) as John's attorney, was admittedly representing Kathryn in the power-of-attorney matter, prepared the power-of-attorney at John's, not Kathryn's, request and failed to make full disclosure to Kathryn of the attendant circumstances, to advise her to consult with separate counsel or to obtain Kathryn's consent to the representation. Respondent's conduct in this regard clearly violated *RPC* 1.7.

We find, however, inadequate evidence to support a determination that respondent's secretary had notarized the power-of-attorney after it was "signed" by Kathryn.

▮ Respondent also violated *RPC* 1.7 when he prepared Kathryn's 1980 will. His failure to disclose to Kathryn his past and present attorney-client relationship with John and Jack, to advise Kathryn of the opportunity to be represented by independent counsel, and to obtain her consent to his representation created a conflict of interest in violation of *RPC* 1.7.

Regarding his representation of Kathryn, respondent's most egregious conduct was his preparation of Kathryn's estate plan and her 1985 will. Respondent, without Kathryn's knowledge, engaged a tax attorney and tax accountant to create a complicated estate plan that was different from the disposition of assets provided for in Kathryn's prior 1980 will. Respondent believed that Kathryn understood the import of the estate plan. Support for that belief is found in the testimony of the nursing home employees, who treated Kathryn on a daily basis. Nothing in the record compels a conclusion contrary to respondent's belief that Kathryn understood the general concepts of the estate plan.

Kathryn's 1985 will and estate plan most likely conformed with her intent. She had raised John, sending him to the University of Pennsylvania. She lived near him and watched Jack grow up. Employees of the nursing home testified to the care, attention, and love between John and Kathryn. Both Kathryn and her husband were well maintained at the nursing home. After Kathryn's illness, John managed the business of Camp Osborn. In

1987, when Marion's estate did not have sufficient funds to pay estate taxes, John had contributed $20,000 of his personal funds to pay the taxes. Moreover, Marion had named John as the alternate executor of her will, and Stanley, the other brother, left most of his estate to John and Jack and their wives.

Nonetheless, respondent's claim that he was representing Kathryn, as well as John, Jack, and Loretta, alone required disclosure to all the parties, advice to all the parties to seek independent counsel, and a waiver from all the parties. An examination of the totality of circumstances surrounding the preparation of Kathryn's estate plan and her 1985 will discloses that respondent violated *RPC* 1.4 by failing to keep Kathryn informed so that she could make an informed decision, *RPC* 1.7(a) and (b) by representing conflicting interests without formal consent and disclosure of the various interests, and *RPC* 5.4(c) by allowing his legal services, particularly with respect to the estate plan, to be influenced by John rather than his client, Kathryn.

In addition, respondent failed to produce notes of the November 1984 meeting with Kathryn. In his file, respondent had only several sheets from a legal pad that he used to record Kathryn's wishes as to what to leave and to whom. In large print, one sheet read "JACK," another "BART," and the third "STANLEY." A fourth sheet had the numbers "One," "Five," "Ten" and "Twenty" written on it. The fifth sheet contained the following figures: "$1,000," "5,000," "10,000," "20,000," and "O." Respondent claims that he prepared the five sheets in anticipation that Bartlett would contest Kathryn's will, just as he had contested Marion's will.

Respondent, nevertheless, failed to take detailed notes of the meeting, tape-record the meeting, or have a witness present. Respondent assumed that Kathryn was in "good mental shape" and that she knew what she was doing. Respondent based this assumption on the nursing home staff's assurances, on comments made by the Osborns, and, allegedly, on statements from Dr. Bregman.

Faced with a situation fraught with conflicts of interest in dealing with the will of a woman who had had a stroke and knowing that one branch of Kathryn's family was not being left anything, the branch that he did not represent, respondent failed to take the precautionary step of documenting Kathryn's competency in agreeing to the estate plan and the will or to urge her to obtain outside counsel. The DRB found that such neglect constituted gross negligence in violation of *RPC* 1.1(a). The DEC found that conduct to be akin to professional malpractice, rather than ethical misconduct. We need not decide when the line of ordinary negligence is passed. The clearly established conflicts of interest and respondent's other ethical violations warrant the discipline that we impose.

Respondent also violated *RPC* 1.7 when he purchased the Drum Point property from John and Loretta, who should have had independent counsel. Likewise, he violated *RPC* 1.8(a) when he entered into the business transaction with his clients, and *RPC* 1.8(b) when he failed to advise Kathryn and/or John that the value of the property could substantially increase if it was subdivided, a fact an attorney with respondent's experience in land use and municipal law would have known. Even if respondent believed that he did not represent Kathryn after February 13, 1987, he obviously began negotiating with John for that property on or before that date. Yet, he never advised Kathryn that he was likely to purchase her property.

### III

There remains the question of what discipline should be imposed. The purpose of discipline is not to punish the offender, but to protect the public. *In re Goldstaub,* 90 *N.J.* 1, 5, 446 *A.*2d 1192 (1982). That goal is consistent with our need to maintain the public's confidence in the integrity of attorneys. *Ibid.* "The severity of discipline to be imposed must comport with the seriousness of the ethical infractions in light of all the relevant circum-

stances." *In re Nigohosian,* 88 *N.J.* 308, 315, 442 *A.*2d 1007 (1982).

■ Respondent's conduct regarding his preparation of Kathryn's power-of-attorney, her wills, and the estate plan discloses that respondent did not appreciate the importance of the concept of conflicts of interest. Respondent claims that he was attempting to represent "family" interests in doing that which was best for the family. However, "ignorance or gross misunderstanding of these rules does not excuse misconduct." *In re Berkowitz,* 136 *N.J.* 134, 147, 642 *A.*2d 389 (1994).

Generally, we have found that in cases involving conflicts of interest, absent egregious circumstances or serious economic injury to the clients involved, a public reprimand constitutes appropriate discipline. *Id.* at 148, 642 *A.*2d 389 (citations omitted). When an attorney's conflict of interest causes serious economic injury to clients, however, we have imposed a period of suspension. *See In re Dato,* 130 *N.J.* 400, 614 *A.*2d 1344 (1992) (imposing one-year suspension on attorney who purchased client's property at below fair-market price); *In re Humen,* 123 *N.J.* 289, 586 *A.*2d 237 (1991) (imposing two-year suspension on attorney who was engaged in numerous sensitive business transactions with client in which attorney's interests were directly in conflict with those of client); *In re Harris,* 115 *N.J.* 181, 557 *A.*2d 657 (1989) (imposing two-year reciprocal suspension for inducing one client to lend large sums to another client of whom respondent was creditor, without informing first client of financial difficulties of borrowing client); *In re Reiss,* 101 *N.J.* 475, 502 *A.*2d 560 (1986) (imposing one-year suspension on attorney who exhibited gross disregard of conflicts of interest with clients who were also partners); *In re Gallop,* 85 *N.J.* 317, 426 *A.*2d 509 (1981) (imposing six-month suspension on attorney who took deed to housekeeper's real property, to her disadvantage); *In re Hurd,* 69 *N.J.* 316, 354 *A.*2d 78 (1976) (imposing three-month suspension on attorney who advised client to transfer title to real property to attorney's sister for twenty percent of property's value).

Unlike the respondents in those cases, respondent's unethical conduct with respect to his representation of Kathryn was not for his own pecuniary benefit. His actions, however, did cause hardship to his clients, John and Jack, who were involved in a will contest and then in a malpractice action against respondent. His actions also very likely resulted in Kathryn's estate being distributed in a manner that did not conform with her probable intent.

Respondent's purchase of the Drum Point property, however, was for his own benefit. Repeatedly, we have warned attorneys of the dangers of engaging in business transactions with their clients. *E.g., In re Humen, supra,* 123 *N.J.* at 300, 586 *A.*2d 237. An attorney should refrain from engaging in a business transaction with a client who has not obtained independent legal advice on the matter. *In re Barrett,* 88 *N.J.* 450, 453, 443 A.2d 678 (1982). We apply that rule because an attorney's judgment can be impaired by his self-interest. In such a situation, an attorney has a duty to explain carefully, clearly, and cogently why independent advice is needed. *In re Humen, supra,* 123 *N.J.* at 300, 586 *A.*2d 237.

In view of respondent's background in real estate and land use, he either knew that a subdivision of the property was possible, if not likely, and that a subdivision would increase the price of the property significantly. Although he had John and Loretta sign an acknowledgment, that document did not include any acknowledgment of conflict, no statement concerning the establishment of the price, and no mention of the possibility of subdivision. Moreover, he never explained to Kathryn, when she was transferring the property to John, that it was likely that he would purchase it.

Respondent's misconduct was not just limited to a single aberrant act. Nor was he a young, inexperienced attorney. His conduct continued over an eight-year period, and although the conduct involved only one family, the ethical transgressions were many.

■ Yet, we are mindful of the many tributes to respondent's impeccable character that we have received and the respect that fellow members of the bar, and the public at large, hold for respondent. He has had an exemplary career. Furthermore, his misconduct was not the result of fraudulent conduct, but rather from a lack of good judgment, which except for the land purchase, was not for his pecuniary gain. If it were not for respondent's conduct with respect to the Drum Point property, we would not impose a suspension. Under the circumstances, however, we find that respondent should be suspended from the practice of law for six months.

Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs.

*For suspension*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.

## ORDER

It is ORDERED that **JOHN P. DOYLE** of **BRICK**, who was admitted to the bar of this State in 1967, is hereby suspended from the practice of law for a period of six months, effective December 16, 1996, and until the further Order of the Court; and it is further

ORDERED that respondent be restrained and enjoined from practicing law during the period of his suspension and that he comply with *Rule* 1:20-20, which governs suspended attorneys; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.