SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**In the Matter of William J. Torre, an Attorney at Law (D-77-14) (075524)**

**Argued September 17, 2015 -- Decided December 16, 2015**

**RABNER, C.J., writing for a unanimous Court.**

In this case, the Court considers the discipline to be imposed on an attorney who borrowed $89,250 from an elderly, unsophisticated client the attorney had known for many years. The loan amounted to about seventy percent of the client's life savings. The terms of the promissory note the attorney prepared were sparse and unfair, the debt was unsecured, and counsel did not advise his client in writing beforehand that it was desirable to seek independent legal advice about the transaction. Counsel repaid only a fraction of the loan during the client's lifetime.

Respondent William J. Torre, of Hasbrouck Heights, was admitted to practice law in New Jersey in 1984. M.D. had been a friend of respondent's family for many years. Respondent became M.D.'s attorney in the early 1990s when he prepared wills for her and her husband. Respondent provided other general legal services to M.D. and M.D. relied on respondent and his office staff for additional help, such as running errands and paying bills. In 2008, M.D. was eighty-six years old, lived alone as a widow, and was legally blind. Although mentally alert, she was unsophisticated about financial matters. On June 18, 2008, M.D. signed a power of attorney in favor of respondent. She also executed a new will that respondent prepared, which named him the executor of her estate.

On June 23, 2008, respondent told M.D. about his personal financial difficulties and she offered to help. Respondent prepared a note that M.D. signed the next day. The unsecured note provided for M.D. to lend respondent $89,250 -- about seventy percent of her total assets -- at an interest rate of ten percent. The note was to be paid in full by August 31, 2008. On June 25, 2008, respondent took M.D. to the bank and she withdrew $89,000. M.D. also paid a $250 fee, which was included in the loan amount. Respondent deposited the funds in his personal account later the same day. In his testimony, respondent claimed that before M.D. executed the note, he told her she "should get the advice of an attorney, [and] [s]he didn't want to hear it." Respondent did not give M.D. written advice on that subject. He also never got written consent from her about the terms of the transaction or his personal role in it.

Respondent at first made only two payments on the loan: $2,500 on May 6, 2009, and $7,500 on June 2, 2009. M.D. ultimately retained another attorney to try to collect the overdue balance. On July 10, 2009, the attorney filed a complaint in Superior Court. A default judgment was entered against respondent on November 30, 2009 in the amount of $90,720. M.D. had filed a grievance against respondent on November 9, 2009. She passed away the following month, before the DEC investigator could meet with her. In January 2011, respondent made one more payment on the note of $9,516.30, representing the proceeds from a short sale of a vacation home he owned.

While preparing for a hearing on the complaint in 2011, respondent claimed he discovered a letter in a storage facility dated June 25, 2008 -- one day after the note was signed. The letter, from respondent to M.D., stated, "[y]ou have been advised to seek independent counsel due to the conflict of interest as I cannot provide advice for the reasons hereinbefore stated." In the last paragraph, respondent asked M.D. to sign the letter to acknowledge her "understanding of the conflict of interest and [her] right to seek independent counsel." Only respondent's signature appears on the letter.

The letter prompted the case to be transferred to the OAE for further investigation, and the DEC complaint was administratively dismissed. The OAE conducted a forensic exam of respondent's computer system to try to determine when the letter was created, but the investigation was inconclusive. Respondent testified that he did not know if the letter had been sent to M.D. In any event, he conceded that even if the letter had been mailed after the note was signed, it still failed to satisfy RPC 1.8(a).

1

The OAE filed a two-count complaint in January 2013. Count one charged respondent with a conflict of interest relating to the loan, in violation of RPC 1.8(a). Count two focused on the June 25, 2008 letter and charged respondent with conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of RPC 8.4(c). A District Ethics Committee panel concluded that respondent violated RPC 1.8(a). It found that the terms of the loan transaction "were not fair and reasonable to the Grievant" and "were not transmitted to her in writing"; that "she was not advised in writing of the desirability of seeking independent legal counsel"; and that she "did not give informed consent to the terms of the transaction." The panel determined that the allegations relating to the June 25, 2008 letter had not been proven by clear and convincing evidence. After weighing the aggravating factors of the transaction and various mitigating factors, the panel recommended that respondent be censured.

The DRB agreed with the panel's findings. The DRB found that respondent engaged in a conflict of interest "without observing the safeguards of RPC 1.8(a)." The Board also found insufficient evidence that respondent fabricated the June 25, 2008 letter and dismissed the RPC 8.4(c) charge. Seven members concluded that respondent should be censured. Two members, in dissent, voted to impose a three-month suspension in light of the "lopsided, risky, and unfair" nature of the transaction, their belief "that respondent knew, all along, that he could not repay" the loan, and respondent's lack of remorse.

Before the Supreme Court, respondent again acknowledged that he violated RPC 1.8(a). He asked the Court to adopt the recommendations of the DEC and the DRB and censure him. The OAE urged that respondent be suspended for three months.

**HELD:** Respondent caused substantial harm to a vulnerable, eighty-six-year-old victim. The egregious circumstances of this case warrant a one-year suspension to protect the public, guard against elder abuse by lawyers, and help preserve confidence in the bar.

1. Lawyers are "required to maintain the highest professional and ethical standards" in their dealings with clients. In re Smyzer, 108 N.J. 47, 57 (1987) (citing In re Gavel, 22 N.J. 248, 262 (1956)). An attorney's duty of loyalty is to the client, and not the lawyer's personal financial interests. When a lawyer has an economic stake in a business transaction with a client, self-interest can undermine the attorney's objectivity. In re Doyle, 146 N.J. 629, 643 (1996). Because clients place trust in their attorney, and often believe their lawyer has greater expertise in financial matters than they do, "a lawyer must take every possible precaution" to ensure that the "client is fully aware of the risks inherent in the proposed transaction and of the need for independent and objective advice." Smyzer, supra, 108 N.J. at 55. RPC 1.8 is designed to protect clients in a number of ways. It specifically tries to insert independent legal counsel into the transaction to get the client unvarnished, unbiased, independent advice. (pp. 8-9)

2. Respondent properly concedes that he violated RPC 1.8(a). The terms of the unsecured note were neither fair nor reasonable; respondent did not advise M.D. in writing to seek advice from an independent attorney; and M.D. did not give informed consent in writing. The discipline imposed in cases in which an attorney borrowed money from a client and violated RPC 1.8(a) has ranged from an admonition to a short suspension. This case, however, presents two egregious circumstances: the level of harm respondent caused and the vulnerability of the victim. Respondent caused substantial harm on two levels. The financial harm M.D. suffered is all too apparent. She lost nearly seventy percent of her life savings through an unsecured loan. The transaction caused M.D. emotional turmoil as well. She was undoubtedly distressed when she realized that she had wrongly placed her trust in a long-time counselor. Respondent victimized a vulnerable, elderly client, and has demonstrated no remorse. (pp. 10-13)

3. The Court considers respondent's conduct against the backdrop of the serious and growing problem of elder abuse. As the population ages, and more people suffer health problems, it is not uncommon for family members to seek the appointment of a guardian to oversee the finances of an incapacitated loved one. Others, like M.D., turn to family or professionals for help and execute powers of attorney in favor of a relative, friend, or trusted lawyer. In those situations, the vast majority of attorneys perform honorably and act in a manner consistent with the highest ethical standards. But regrettably, as more seniors have needed help to manage their affairs, allegations of physical and financial abuse have also increased. (pp. 13-14)

4. The attorney disciplinary system is not designed to punish lawyers. Its goals are to protect the public and preserve the public's confidence in the bar. The imposition of discipline in a particular case is meant to foster continued faith in the legal profession as a whole. Because the conflict in this case resulted in substantial harm to a

vulnerable, elderly victim, the Court finds that respondent should be suspended from the practice of law for one year. In a case like this, if there were clear and convincing proof that an attorney knew at the time he borrowed money from a trusting client that he would not repay it, disbarment would be appropriate. See In re Wolk, 82 N.J. 326, 335 (1980); see also In re Wilson, 81 N.J. 451, 453 (1979). The discipline imposed today is meant to provide notice to attorneys that serious consequences will result from this form of misconduct. (pp. 15-16)

So Ordered.

**JUSTICES LaVECCHIA, ALBIN, PATTERSON and SOLOMON and JUDGE CUFF (temporarily assigned) join in CHIEF JUSTICE RABNER's opinion. JUSTICE FERNANDEZ-VINA did not participate.**

IN THE MATTER OF

WILLIAM J. TORRE,

An Attorney at Law

Argued September 17, 2015 – Decided December 16, 2015

On an Order to show cause why respondent
should not be disbarred or otherwise
disciplined.

Maureen G. Bauman, Deputy Ethics Counsel,
argued the cause on behalf of the Office of
Attorney Ethics.

Raymond F. Flood argued the cause for
respondent (Flood & Basile, attorneys).

CHIEF JUSTICE RABNER delivered the opinion of the Court.

This disciplinary matter involves an attorney who borrowed $89,250 from an elderly, unsophisticated client the attorney had known for many years. The loan amounted to about seventy percent of the client's life savings. The debt was unsecured, and counsel repaid only a fraction of it during the client's lifetime.

Counsel prepared a promissory note to record the loan's sparse and unfair terms, but he did not advise his client in writing beforehand that it was desirable to seek independent

legal advice about the transaction.  Counsel admits that he violated the Rules of Professional Conduct, see RPC 1.8(a), and does not challenge the Disciplinary Review Board's (DRB) determination that he be censured.  The Office of Attorney Ethics (OAE) requests that a three-month suspension be imposed.

Because of the egregious circumstances this case presents, we impose an even lengthier period of suspension.  Respondent caused substantial harm to a vulnerable, eighty-six-year-old victim.  A one-year suspension is warranted to protect the public and guard against elder abuse by lawyers, and to help preserve confidence in the bar.  We also note that misconduct of this nature will result in serious consequences going forward.

## I.

Respondent William J. Torre, of Hasbrouck Heights, was admitted to practice law in New Jersey in 1984.  M.D. had been a friend of respondent's family for many years and was a customer at his parents' laundromat.  Respondent became M.D.'s attorney in the early 1990s when he prepared wills for her and her husband.  Respondent provided other general legal services to M.D. in the years since.  Over time, M.D. also relied on respondent and his office staff for additional help.  They paid her monthly bills and ran occasional errands for her.

2

In 2008, M.D. was eighty-six years old. She lived alone as a widow and was legally blind. Although mentally alert, she was unsophisticated about financial matters.

M.D. signed a power of attorney in favor of respondent on June 18, 2008. She also executed a new will that respondent prepared, which named him the executor of her estate.

Days later, on June 23, 2008, respondent told M.D. about his personal financial difficulties. He mentioned mounting tuition bills and mortgage payments. According to respondent's testimony before the District Ethics Committee (DEC), M.D. asked if she could help. In response, respondent said he needed about $100,000, and M.D. agreed to lend him money.

Respondent prepared a note that M.D. signed the next day, June 24, 2008. The note provided for M.D. to lend respondent $89,250 -- about seventy percent of her total assets. The note listed an interest rate of ten percent and was to be paid in full by August 31, 2008.

The note was unsecured. Respondent testified that he and M.D. did not discuss any collateral for it. According to respondent, he intended to pay the money back on time and considered refinancing his home and a vacation property.

Respondent took M.D. to the bank the following day, June 25, 2008, and she withdrew $89,000. M.D. also paid a $250 fee,

3

which was included in the loan amount.  Respondent deposited the funds in his personal account later the same day.

In his testimony, respondent claimed that before M.D. executed the note, he told her she "should get the advice of an attorney, [and] [s]he didn't want to hear it."  Respondent did not give M.D. written advice on that subject.  He also never got written consent from her about the terms of the transaction or his personal role in it.

Respondent testified that M.D. asked him to make changes to her will several months later.  He said he declined to do so because he was a creditor.  Respondent instead drove M.D. to Paul A. Dykstra, Esquire, on October 15, 2008, and brought a copy of her existing will and the note.  When the two were alone, Dykstra tried to question M.D. about the note and "she kind of cut [him] off."  According to Dykstra, M.D. was aware of the amount of the note, fully expected that respondent would repay her, and "fully trusted him."  When Dykstra pointed out that the note was past due, "she got a little upset because she said she didn't want to talk about the note."

Dykstra prepared a new will for M.D.  When they discussed her assets, M.D. explained that she had sufficient money to take care of the specific bequests but "wasn't 100 percent sure of what she had."  She added that respondent "took care of that" and again noted that she trusted him.

4

Respondent at first made only two payments on the loan: $2,500 on May 6, 2009, and $7,500 on June 2, 2009. M.D. ultimately retained another attorney to try to collect the overdue balance. On July 10, 2009, the attorney filed a complaint in Superior Court. A default judgment was entered against respondent on November 30, 2009 in the amount of $90,720.

M.D. filed a grievance against respondent on November 9, 2009. She passed away the following month, before the DEC investigator could meet with her.

In January 2011, respondent made one more payment on the note of $9,516.30. The amount represented the proceeds from a short sale of a vacation home respondent had owned.

A member of the District IIB Ethics Committee investigated the grievance, which led to the filing of a complaint that alleged unethical conduct. While preparing for a hearing on the complaint in 2011, respondent claimed he discovered a letter in a storage facility dated June 25, 2008 -- one day after the note was signed. The letter, from respondent to M.D., stated, "[y]ou have been advised to seek independent counsel due to the conflict of interest as I cannot provide advice for the reasons hereinbefore stated." In the last paragraph, respondent asked M.D. to sign the letter to acknowledge her "understanding of the

5

conflict of interest and [her] right to seek independent counsel." Only respondent's signature appears on the letter.

The arrival of the letter prompted the case to be transferred to the OAE for further investigation. (The DEC complaint was administratively dismissed.) The OAE conducted a forensic exam of respondent's computer system to try to determine when the letter was created, but the investigation was inconclusive.

Respondent testified that he did not know if the letter had been sent to M.D. In any event, he conceded that even if the letter had been mailed after the note was signed, it still failed to satisfy RPC 1.8(a).

The OAE filed a two-count complaint in January 2013. Count one charged respondent with a conflict of interest relating to the loan, in violation of RPC 1.8(a). Count two focused on the June 25, 2008 letter and charged respondent with conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of RPC 8.4(c).

A panel of the District IIA Ethics Committee conducted a hearing at which respondent and others testified. The panel concluded that respondent violated RPC 1.8(a). It found that the terms of the loan transaction "were not fair and reasonable to the Grievant" and "were not transmitted to her in writing"; that "she was not advised in writing of the desirability of

6

seeking independent legal counsel"; and that she "did not give informed consent to the terms of the transaction."

Based on the record before it, the panel found that the allegations relating to the June 25, 2008 letter had not been proven by clear and convincing evidence.

The panel weighed the aggravating factors of the transaction and various mitigating factors, including respondent's "apparently good reputation and character, the lack of any prior disciplinary history, and his service to the community." The panel ultimately recommended that respondent be censured.

The DRB agreed with the panel's findings. The DRB found that respondent engaged in a conflict of interest "without observing the safeguards of RPC 1.8(a)." The Board also found insufficient evidence that respondent fabricated the June 25, 2008 letter and dismissed the RPC 8.4(c) charge.

Seven members of the DRB concluded that respondent should be censured, after they reviewed with care multiple prior disciplinary cases. Two members, in dissent, voted to impose a three-month suspension in light of the "lopsided, risky, and unfair" nature of the transaction, their belief "that respondent knew, all along, that he could not repay" the loan, and respondent's lack of remorse.

7

Before this Court, respondent again acknowledges that he violated RPC 1.8(a). He asks the Court to adopt the recommendations of the DEC and the DRB and censure him. The OAE urges that respondent be suspended for three months.

II.

Lawyers are "required to maintain the highest professional and ethical standards" in their dealings with clients. In re Smyzer, 108 N.J. 47, 57 (1987) (citing In re Gavel, 22 N.J. 248, 262 (1956)). At all times, an attorney's duty of loyalty is to the client, and not the lawyer's personal financial interests. When a lawyer has an economic stake in a business transaction with a client, self-interest can undermine the attorney's objectivity. In re Doyle, 146 N.J. 629, 643 (1996). It can also impair the "undivided loyalty" that lawyers owe their clients. In re Wolk, 82 N.J. 326, 333 (1980).

For those reasons, this Court has "[r]epeatedly . . . warned attorneys of the dangers of engaging in business transactions with their clients." Doyle, supra, 146 N.J. at 643. Such transactions "are subject to close scrutiny and the burden of establishing fairness and equity . . . rests upon the attorney." In re Gallop, 85 N.J. 317, 322 (1981).

Because clients place trust in their attorney, and often believe their lawyer has greater expertise in financial matters than they do, "a lawyer must take every possible precaution" to

8

ensure that the "client is fully aware of the risks inherent in the proposed transaction and of the need for independent and objective advice."  Smyzer, supra, 108 N.J. at 55.  In short, "an attorney has a duty to explain carefully, clearly, and cogently why independent [legal] advice is needed."  Doyle, supra, 146 N.J. at 643.

RPC 1.8 attempts to implement those important principles. The rule provides that

> [a] lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
>
> (1) the transaction and terms in which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner than can be understood by the client;
>
> (2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel of the client's choice concerning the transaction; and
>
> (3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.
>
> [RPC 1.8(a) (emphasis added).]

The rule is designed to protect clients in a number of ways.  It specifically tries to insert independent legal counsel into the

9

transaction to get the client unvarnished, unbiased, independent advice.

## III.

Respondent properly concedes that he violated RPC 1.8(a). The terms of the unsecured note were neither fair nor reasonable; respondent did not advise M.D. in writing to seek advice from an independent attorney; and M.D. did not give informed consent in writing. As the DEC panel noted, respondent's violation of the Rules of Professional Conduct was far from technical. Had he followed RPC 1.8(a), it is hard to imagine that any lawyer would have advised M.D. to place her life savings at risk and lend her lawyer a substantial amount of money with no security or collateral to protect her.

We therefore turn to consider the proper level of discipline. As this Court observed in Doyle, supra, nearly twenty years ago, "in cases involving conflicts of interest, absent egregious circumstances or serious economic injury to the clients involved, a public reprimand [generally] constitutes appropriate discipline." 146 N.J. at 642 (citing In re Berkowitz, 136 N.J. 134, 148 (1994)).

The DRB reviewed a number of cases in which an attorney borrowed money from a client and violated RPC 1.8(a). The discipline imposed in those matters ranged from an admonition to a short suspension. See, e.g., In re Strait, 205 N.J. 469

10

(2011) (reprimanding attorney who used companion credit card linked to client's account and ran balance up to more than $49,000); In re Moeller, 201 N.J. 11 (2009) (suspending for three months attorney who borrowed $3,000 from client and had prior disciplinary record); In re Frank J. Jess, DRB 96-068 (June 3, 1996) (admonishing attorney who borrowed $30,000 from clients to satisfy gambling debt).[1]  This case, however, presents two egregious circumstances:  the level of harm respondent caused and the vulnerability of the victim.

Respondent caused substantial harm on two levels.  The financial harm M.D. suffered is all too apparent.  She lost nearly seventy percent of her life savings through an unsecured loan.  See Doyle, supra, 146 N.J. at 642 ("When an attorney's conflict of interest causes serious economic injury to clients, . . . we have imposed a period of suspension.") (citing cases).

The transaction caused M.D. emotional turmoil as well. Months afterward, she declined to discuss the loan at length with a new attorney because she was upset.  She was undoubtedly distressed when she realized that she had wrongly placed her trust in a long-time counselor.  Rather than be able to enjoy

---

[1] DRB decisions are available on a website that Rutgers School of Law – Newark maintains.  See Decisions of the New Jersey Supreme Court, Disciplinary Review Board, Rutgers School of Law – Newark, http://njlaw.rutgers.edu/collections/drb; see also Disciplinary Review Board, New Jersey Courts, http://drblookupportal.judiciary.state.nj.us/Search.aspx.

11

her twilight years in peace, she was forced to file a lawsuit to try to recoup her life savings.

In addition, respondent victimized a vulnerable, elderly client. At age eighty-six, M.D. had lost most of her eyesight and was increasingly dependent on others. Although mentally alert, she was unsophisticated about her finances. She relied on respondent and his staff to pay her bills and assist with other matters. Just days after M.D. gave respondent power of attorney, he offered his longstanding client a proposal that any reasonable attorney would have cautioned against: an unsecured loan with little prospect of repayment.

The DEC also observed a lack of remorse. The panel noted that respondent "testified in a detached fashion, exhibited no real remorse, did not express an intent on his part to pay the amount due on the note to [M.D.'s] estate, or to somehow 'make it right.'"

At oral argument before the Court, respondent left a similar impression. He initially described what occurred as a "mistake." When pressed, he admitted his conduct was "wrong." He also did not know the amount of the judgment he owed. Respondent confirmed that he had made no recent payments and represented that, although he had accumulated $25,000, he was waiting to pay off the judgment all at once on the advice of counsel. In other words, respondent made few loan repayments

12

during M.D.'s life, and none in the four and one-half years leading up to his appearance before the Court.

After oral argument, the Court asked respondent to represent when he would turn over the $25,000 to M.D.'s estate and when he would pay the remainder owed.  Respondent paid the estate $25,000 on October 15, 2015 and advised that he had "formulated a schedule" to pay the note in full with interest by December 2017.  He later provided a copy of the schedule.

## IV.

We consider respondent's conduct against the backdrop of the serious and growing problem of elder abuse.  The State's population is steadily aging.  From 2000 to 2010, the number of people in our State age sixty-five and older grew by 6.5 percent -- faster than the total population.  See N.J. Dep't of Labor and Workforce Dev., Census 2010 Highlights 53, http://lwd.dol.state.nj.us/labor/lpa/content/njsdc/AFF/2010High lights.pdf (last visited Dec. 9, 2015).  As of 2012, seniors accounted for 14.1 percent of the State's total population, or 1.25 million.  N.J. Dep't of Labor and Workforce Dev., Population and Labor Force Projections for New Jersey: 2012 to 2032 8, http://lwd.dol.state.nj.us/labor/lpa/content/njsdc/2015 Projections%202032.pdf (last visited Dec. 9, 2015); N.J. Dep't of Labor and Workforce Dev., Projections of Total Population by Age and Sex: New Jersey, 2012 to 2032,

http://lwd.dol.state.nj.us/labor/lpa/dmograph/lfproj/sptab2.htm (last visited Dec. 9, 2015). The Department of Labor and Workforce Development projects that the State's elderly population will grow to 21.8 percent of the total population by the year 2032. Population and Labor Force Projections for New Jersey: 2012 to 2032, supra, at 8.

As the population ages, and more people suffer health problems, it is not uncommon for family members to seek the appointment of a guardian to oversee the finances of an incapacitated loved one. In recent years, judges in New Jersey have appointed more than 2,000 guardians annually, see New Jersey Courts, Guardianship Support, http://www.judiciary.state. nj.us/guardianship (last visited Dec. 9, 2015), a number that is expected to grow. Others, like M.D., turn to family or professionals for help and execute powers of attorney in favor of a relative, friend, or trusted lawyer.

In those situations, the vast majority of attorneys perform honorably and act in a manner consistent with the highest ethical standards. But regrettably, as more seniors have needed help to manage their affairs, allegations of physical and financial abuse have also increased. See Naomi Karp & Erica Wood, Guardianship Monitoring: A National Survey of Court Practices, AARP Pub. Policy Inst. 4 (June 2006), http://assets. aarp.org/rgcenter/consume/2006_14_guardianship.pdf.

V.

The attorney disciplinary system is not designed to punish lawyers. Its goals are to protect the public, In re Witherspoon, 203 N.J. 343, 358 (2010), and preserve the public's confidence in the bar, In re Cohen, 220 N.J. 7, 11 (2014). The imposition of discipline in a particular case, thus, is meant to foster continued faith in the legal profession as a whole.

Because the conflict in this case resulted in substantial harm to a vulnerable, elderly victim, we find that respondent should be suspended from the practice of law for one year. In doing so, we take into account that respondent has no prior disciplinary history and consider the favorable character evidence presented by four witnesses at the DEC hearing.

Respondent represented to the Court that he would satisfy the judgment against him in full by December 2017. We direct that he provide quarterly updates about the status of upcoming payments.

Until now, few reported disciplinary cases have involved harm to vulnerable, elderly victims. As with all matters, each case of this type must be decided on its own merits. Some may call for less discipline; others will justify an even longer suspension or disbarment. Indeed, in a case like this, if there were clear and convincing proof that an attorney knew at the time he borrowed money from a trusting client that he would not

15

repay it, disbarment would be appropriate.  See Wolk, supra, 82 N.J. at 335; see also In re Wilson, 81 N.J. 451, 453 (1979). The discipline imposed today is meant to provide notice to attorneys that serious consequences will result from this form of misconduct.

VI.

For the reasons outlined above, respondent is suspended from the practice of law for one year.


JUSTICES LaVECCHIA, ALBIN, PATTERSON and SOLOMON and JUDGE CUFF (temporarily assigned) join in CHIEF JUSTICE RABNER's opinion.  JUSTICE FERNANDEZ-VINA did not participate.

SUPREME COURT OF NEW JERSEY

NO. __D-77__          SEPTEMBER TERM 2014

DISPOSITION___Order to Show Cause Why Respondent Should___
___Not be Disbarred or Otherwise Disciplined___


IN THE MATTER OF

WILLIAM J. TORRE,

An Attorney at Law


DECIDED_____December 16, 2015_____
OPINION BY_____Chief Justice Rabner_____
CONCURRING OPINION BY_____
DISSENTING OPINION BY_____

| CHECKLIST | SUSPEND | | |
|---|---|---|---|
| CHIEF JUSTICE RABNER | X | | |
| JUSTICE LaVECCHIA | X | | |
| JUSTICE ALBIN | X | | |
| JUSTICE PATTERSON | X | | |
| JUSTICE FERNANDEZ-VINA | -------------- | | |
| JUSTICE SOLOMON | X | | |
| JUDGE CUFF (t/a) | X | | |
| TOTALS | 6 | | |

IN THE MATTER OF          :

WILLIAM J. TORRE,         :          O R D E R

FILED

AN ATTORNEY AT LAW        :

DEC 16 2015

(Attorney No. 012931984):

CLERK

It is ORDERED that **WILLIAM J. TORRE** of **HASBROUCK HEIGHTS**, who was admitted to the bar of this State in 1984, is suspended from the practice of law for a period of one year and until the further Order of the Court, effective January 15, 2016; and it is further

ORDERED that **WILLIAM J. TORRE** submit to the Office of Attorney Ethics and to the Clerk of the Supreme Court, on a schedule to be established by the Office of Attorney Ethics, quarterly reports that demonstrate respondent's compliance with the repayment schedule on the outstanding balance of the loan; and it is further

ORDERED that respondent comply with Rule 1:20-20 dealing with suspended attorneys; and it is further

ORDERED that pursuant to Rule 1:20-20(c), respondent's failure to comply with the Affidavit of Compliance requirement

of Rule 1:20-20(b)(15) may (1) preclude the Disciplinary Review Board from considering respondent's petition for reinstatement for a period of up to six months from the date respondent files proof of compliance; (2) be found to constitute a violation of RPC 8.1(b) and RPC 8.4(c); and (3) provide a basis for an action for contempt pursuant to Rule 1:10-2; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs and actual expenses incurred in the prosecution of this matter, as provided in Rule 1:20-17.


WITNESS, the Honorable Stuart Rabner, Chief Justice, at Trenton, this 16th day of December, 2015.

CLERK OF THE SUPREME COURT

The foregoing is a true copy
of the original on file in my office.

CLERK OF THE SUPREME COURT
OF NEW JERSEY